770 A.2d 1126

LISA PFENNINGER, EXECUTRIX OF THE ESTATE OF MAT-
THEW PFENNINGER, DECEASED, PLAINTIFF–RESPON-
DENT, v. HUNTERDON CENTRAL REGIONAL HIGH SCHOOL,
HUNTERDON CENTRAL REGIONAL HIGH SCHOOL DIS-
TRICT BOARD OF EDUCATION, HUNTERDON COUNTY, A.J.
O'SULLIVAN ARCHITECTS, ANDREW J. O'SULLIVAN, C.J.
O'SULLIVAN, C.J. OSTERGAARD, JOHN STANA, BARRY IM-
BOWDIN AND KENNETH R. QUABECK, DEFENDANTS–AP-
PELLANTS, AND HUNTERDON COUNTY SOIL CONSERVA-
TION, RARITAN TOWNSHIP, STATE OF NEW JERSEY, FRED
CAPPOLA, MARK SYMANCEK, AARON PLUMBING, JOHN
DOES 1–10 (SAID NAMES BEING FICTITIOUS) AND RICHARD
ROES 1–10 (SAID NAMES BEING FICTITIOUS), DEFEN-
DANTS.

Argued September 26, 2000—Decided March 13, 2001.

*John H. King* argued the cause for appellants A.J. O'Sullivan Architects, Andrew J. O'Sullivan, C.J. O'Sullivan, Kenneth R. Quabeck and C.J. Ostergaard (*Marshall, Dennehy, Warner, Coleman & Goggin,* attorneys; *Mr. King* and *John H. Osorio,* of counsel).

*Robert A. McLarty, Jr.,* argued the cause for appellants Hunterdon Central Regional High School, Hunterdon Central Regional High School District Board of Education, Hunterdon County, John Stana and Barry Imbowdin (*Romando, Astorino & McLarty,* attorneys).

*Victor A. Rotolo* argued the cause for respondent (*Mr. Rotolo,* attorney; *Michael F. Midlige* and *Matthew F. Richter,* on the brief).

*Arthur Bergman* submitted a brief on behalf of amicus curiae, Consulting Engineers Council of New Jersey (*Sokol, Behot & Fiorenzo,* attorneys).

PER CURIAM.

This wrongful death action was instituted to recover damages resulting from the death of twenty-nine-year-old Matthew Pfenninger who was killed when an eight-to-nine-foot-deep trench collapsed on top of him while he was installing drainage pipe. The appeal presents three primary issues. The first issue is whether the landowner, Hunterdon Central Regional High School District Board of Education (Board) and the architect, A.J. O'Sullivan Architects, P.A. (O'Sullivan), breached a duty of care to Pfenninger arising out of a responsibility to supervise Pfenninger's company in the excavation and piping of the trench. The second issue is whether the trial court abused its discretion in denying plaintiff's requests for discovery of other documents involving O'Sullivan's

responsibility to the Board on related construction projects.[1] The third issue concerns whether the Board breached its duty to Pfenninger in negligently supplying Pfenninger with nonconforming drainage pipe that required his entry into the trench to connect it.

I

▉ The material facts concerning the claim that the Board and O'Sullivan breached a duty of care to Pfenninger arising out of their responsibility to supervise Pfenninger's company in the excavation and piping of the trench are set forth in the Appellate Division's opinion reported at 338 *N.J.Super.* 572, 576–81, 770 *A.*2d 1173, 1176–79 (2001), as well as in Justice Coleman's dissenting opinion. Post at 245–48, 770 *A.*2d at 1134–36. We incorporate the relevant facts by reference. A majority of the Court is substantially in agreement with Justice Coleman's conclusion that, based on the present record, plaintiff has not established that either the Board or O'Sullivan breached a duty of care to Pfenninger because of their failure to supervise Pfenninger's company in the excavation and piping of the trench. In that respect we disagree with the Appellate Division's disposition, that court having found a triable issue of fact on the issue of negligent supervision.

---

[1] As our dissenting colleague observes, *post* at 249–51, 770 *A.*2d at 1137–38, the discovery issue is not raised in defendants' petitions for certification, the Appellate Division having ruled in their favor on that question. Plaintiff, who was the prevailing party in the Appellate Division, did not file a protective cross-petition, see *R.* 2:12–3(b), to present that issue directly to this Court. Nevertheless, the Court has the benefit of the parties full.briefing of the issue before the Appellate Division. In view of the majority's determination to remand the matter to the Law Division for trial on the issue of the Board's alleged negligence in supplying Pfenninger with nonconforming drainage pipe, we are persuaded, in the interests of efficient case management, that we also should address and resolve the discovery issue because our disposition will require that the Law Division order that additional discovery be conducted before the trial commences. See *R.* 2:12–11.

Nevertheless, although we modify the Appellate Division's disposition, we affirm its judgment remanding the negligent supervision claim to the Law Division for further proceedings based on our view that the trial court abused its discretion in denying plaintiff's request for further discovery. As we understand the record, plaintiff requested a number of documents from O'Sullivan and the Board. The trial court upheld defendants' refusal to supply those documents on the ground that plaintiff's discovery request was "unduly burdensome, overly broad, and not reasonably calculated to lead to admissible evidence." Among the items plaintiff sought were the following:

Any and all records, notes, correspondence, plans, drawings, sketches, bids, requests for bids, work orders, invoices, or documents of any kind concerning projects involving A.J. O'Sullivan Architects at the Hunterdon Central Regional High School for the period of January 1, 1993 through January 1, 1995, including but not limited to the fountain and scoreboard projects.

According to plaintiff, that information was necessary because the initial discovery did not uncover evidence of a written contract between the Board and O'Sullivan setting forth their respective duties and obligations on the job Pfenninger was hired to complete. Thus, evidence of the supervisory responsibilities of the Board and O'Sullivan on the related projects could lead a jury to infer that they had a greater managerial role in Pfenninger's project than they acknowledged, and a concomitant duty of care.

Further, that evidence would be critical in assessing the verity of the position advanced by O'Sullivan and the Board that neither was responsible for supervising Pfenninger when he dug the trench and that no one, in fact, oversaw that job. That evidence also may provide an important link to plaintiff's expert's opinions that concluded that the Board and O'Sullivan "were engaged in coordination of the work being done" by Pfenninger; that both were acting as "general contractor/project manager;" and that O'Sullivan and the Board "fail[ed] . . . to exercise due care in their joint and separate obligations to jobsite workers."

In our view, both the Law Division and the Appellate Division erred in their disposition of the discovery issue. Plaintiff was

entitled to attempt to discover evidence concerning related construction projects involving the Board and O'Sullivan that might have a bearing on O'Sullivan's and the Board's general supervisory responsibilities on construction projects then in progress on the Board's properties. See *In re Liquidation of Integrity Ins. Co.*, 165 *N.J.* 75, 82, 754 *A.*2d 1177 (2000)(noting that parties may obtain discovery regarding any non-privileged matter that is relevant to subject of pending action or is reasonably calculated to lead to discovery of admissible evidence). Accordingly, on remand, the trial court shall permit plaintiff, through appropriate discovery requests, see *R.* 4:10–1, to attempt to elicit information concerning O'Sullivan's and the Board's responsibilities on those related projects. The trial court may exercise its discretion, consistently with the views expressed in this opinion, concerning the proper scope and extent of such discovery. We intimate no view whatsoever on whether the documents and information produced in the course of such discovery will lead to evidence establishing a claim of negligent supervision on the part of the Board or O'Sullivan that will survive summary judgment. Our remand to the trial court for further discovery is without prejudice to defendants' right to renew their motion for summary judgment when that discovery has been completed.

## II

We address separately and in detail plaintiff's claim that the Board's negligence in providing Pfenninger with nonconforming pipe was a proximate cause of his death.

Pfenninger was the owner of Countywide Excavating Company (Countywide) and he contracted with the Board to install a drainage remediation system for the Hunterdon Central Regional High School's varsity baseball and soccer/lacrosse fields. The installation of the drainage pipe was the last phase of a three-phase construction project to improve the high school's athletic fields.

Under the terms of Pfenninger's agreement with the Board and O'Sullivan, the Board was required to supply Pfenninger with the materials to complete the project. Pursuant to the agreement, Pfenninger wrote to the Board to request the following pipe: "495' of 6" poly pipe ... 730' of 8" poly pipe ... (20) 6"–4" T ... [and] (20) 4" caps." The specifications for the pipe were set forth initially in O'Sullivan's design specifications and drawings of the field drainage project, which called for *"perforated 6" or 8"* corrugated *polyethylene plastic underdrain pipe* w/ filter fabric stock." (Emphasis added).

Corrugated polyethylene pipe is a plastic flexible pipe that is available in long lengths. When the pipe is perforated, the holes in the pipe allow water to enter and escape the pipe. Perforated corrugated polyethylene pipe is commonly used as drainage piping because a contractor can install the pipe from the outside of an excavation trench without entering it. Because the pipe is flexible, as one end of the pipe is laid down in the trench the other end can remain out of the trench for connection. At his deposition, Andrew O'Sullivan, president of O'Sullivan, confirmed that the plans and specifications for the project required perforated and corrugated polyethylene pipe. He described the design specifications in the following exchange:

Q: Is any type of pipe[ ] specified to be used as the drainage piping?

A: Perforated.

Q: You are reading from typical trench detail.

A: Perforated six-inch or eight-inch corrugated polyethylene plastic on the drain pipe would fill the fabric sock.

Q: What is "perforated pipe?"

A: It means it has holes in it to allow water to enter or escape, whatever.

Q: What is corrugated pipe?

A: Corrugated pipe is pipe that has alternating larger/smaller diameters so it is flexible.

Q: Okay. That is my next question. Is corrugated perforated pipe flexible?

A: Yes.

Q: By definition?

A: Pretty much, yes.

Q: What is polyethylene pipe?

A: It is a plastic pipe.

O'Sullivan was then asked about how that pipe is assembled:

Q: And you understood when you created these plans, if I understand your testimony correctly, that the pipe could have been assembled on the surface and put into the trench?
This perforated corrugated polyethylene pipe?
A: It could have, sure.

The Board first ordered the pipe from Aaron & Company (Aaron), which erroneously shipped thirteen-foot lengths of six- and eight-inch non-perforated PVC pipe instead of perforated corrugated polyethylene pipe. PVC pipe is a rigid pipe made in shorter lengths, and requires an individual who is installing the pipe to connect the pipes in the trench. Pfenninger discussed the nonconforming shipment with Barry Imbowdin, the high school's supervisor of grounds and maintenance, and Imbowdin agreed that the pipe was "wrong" and should be exchanged for the correct pipe. Thereafter, Imbowdin called Aaron and told them that Pfenninger received the wrong pipe and needed an exchange. However, Aaron never sent Pfenninger a complete order of conforming pipe.[2]

On August 9, 1994, the Board ordered the pipe required for the job from a different supplier, Modern Concrete Septic Tank Co. (Modern). Two days later, Modern sent forty-seven ten-foot lengths of six-inch pipe and thirty-seven twenty-foot lengths of eight-inch pipe. The eight-inch pipe conformed to the specifications because it was perforated, corrugated, and flexible. However, the six-inch pipe, although perforated, did not conform because it was not corrugated or flexible. Under pressure from the Board to complete the project before the start of the school year, Pfenninger decided to use the nonconforming pipe and entered the trench to connect the sections of pipe. Robert Shinkle who

---

[2] The record indicates that Aaron exchanged some of the six-inch piping for six-inch perforated pipe. However, the record is unclear whether the pipe from the second shipment was corrugated polyethylene pipe. The record suggests that Aaron could not fulfill Pfenninger's request because it did not have conforming pipe in stock.

worked with Pfenninger on the job site stated that the pipe was rigid and had to be connected "every 10-feet or so." Similarly, Lisa Pfenninger, Pfenninger's widow, stated that the PVC pipe was not flexible, "difficult to connect," and required Pfenninger to enter the trench. According to David Brong, Pfenninger's employee who witnessed the accident, Pfenninger was connecting the non-conforming ten-foot long six-inch pipe in the trench when the trench collapsed.

### III

"Negligence is conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm." *Restatement (Second) of Torts* § 282 (1965). A person acts negligently when he or she does not take reasonable precautions to prevent causing harm to another. *Id.* § 284. To determine whether a defendant's conduct is negligent, we consider what a "prudent man" would have done in the defendant's circumstances. *Weinberg v. Dinger,* 106 *N.J.* 469, 484, 524 *A.*2d 366 (1987). In addition to showing that a defendant failed to act with reasonable care, a plaintiff must show that a defendant owed the injured party a duty of care. *Kelly v. Gwinnell,* 96 *N.J.* 538, 548, 476 *A.*2d 1219 (1984). Traditionally, courts have determined the circumstances under which a defendant owes a legal duty to another. *Carvalho v. Toll Bros. & Developers,* 143 *N.J.* 565, 572, 675 *A.*2d 209 (1996). Similarly, the scope of the duty owed is a matter of law. *Kelly, supra,* 96 *N.J.* at 552, 476 *A.*2d 1219.

We recognize that a court should not treat questions of duty in a conclusory fashion because " 'whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.' " *Id.* at 544, 476 *A.*2d 1219 (quoting *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962)); *see Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993); *see also Rappaport v.*

*Nichols,* 31 *N.J.* 188, 205, 156 *A.*2d 1 (1959) (stating that "policy considerations and the balancing of conflicting interests are the truly vital factors in the molding and application of the common law principles of negligence"); *Wytupeck v. Camden,* 25 *N.J.* 450, 462, 136 *A.*2d 887 (1957) (concluding that "duty must of necessity adjust to the changing social relations and exigencies and man's relation to his fellows"). That weighing process is "fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct." *Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110.

 The common law recognizes the differences between civil actions for breach of contract and for tort. "Tort obligations are [ ] obligations that are imposed by law on policy considerations to avoid some kind of loss to others. They are obligations imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 92, at 656 (5th ed.1984). Thus, "if a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not." William L. Prosser, *Handbook of the Law of Torts* § 33, at 205 (1st ed. 1941).

 Thus, in a contractual relationship, an individual may be liable in tort if he or she undertakes "gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things." *Restatement (Second) of Torts* § 323 (1965). In this case, the Board and Pfenninger entered into a contract for the installation of a drainage remediation system for Hunterdon High School's baseball and soccer/lacrosse fields. As part of that contract, the Board was required to provide Pfenninger with perforated corrugated polyethylene pipe. Although the record is silent on whether the Board knew the purpose for the perforated corrugated polyethylene pipe, the record demonstrates that O'Sul-

livan, the project's architect, knew that that specific pipe could be installed above ground and without having someone enter the trench. Therefore, O'Sullivan's knowledge can be imputed to the Board because the record demonstrates that O'Sullivan was the Board's agent and presided over the Board's three-phase project to renovate Hunterdon High School's athletic fields. See *Handleman v. Cox*, 39 *N.J.* 95, 104, 187 *A.*2d 708 (1963) (stating that "it is well settled that a principal is charged with the knowledge of his agent or servant respecting matters lying within the scope of the duties, activities, and responsibilities entrusted to him by the principal") (citations omitted).

Acting within its scope of authority, O'Sullivan not only prepared the plans and specifications for the field drainage project, but it solicited bids from prospective contractors and made recommendations to the Board. Accordingly, a reasonable jury could find that the Board's failure to supply the correct pipe to Pfenninger not only constituted a breach of the Board's contractual duty, but also a breach of the Board's duty of care to provide the pipe specified in O'Sullivan's drawings that would diminish significantly Pfenninger's risk of harm.

A jury also could find that the Board's failure to supply Pfenninger with a complete set of perforated corrugated polyethylene pipe was a proximate cause of Pfenninger's death. In tort cases "[l]iability depends not only on the breach of a standard of care but also on a proximate causal relationship between the breach of the duty of care and resultant losses." *People Exp. Airlines, Inc. v. Consolidated Rail Corp.*, 100 *N.J.* 246, 264, 495 *A.*2d 107 (1985). Our Court has defined proximate cause as "that combination of 'logic, common sense, justice, policy and precedent' that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery." *Ibid.* (quoting *Caputzal v. Lindsay Co.*, 48 *N.J.* 69, 77–78, 222 *A.*2d 513 (1966)). Because the Board failed to supply Pfenninger with flexible, perforated corrugated polyethylene pipe that could be assembled out of the trench, Pfenninger was re-

quired to enter the trench to install the non-flexible pipe. Accordingly, a reasonable jury could find that the Board's delivery of rigid, non-flexible pipe created a foreseeable risk of harm to Pfenninger that was not so remote as to bar recovery.

We acknowledge that the record suggests that Pfenninger may have been negligent in not bracing or shoring the walls of the trench as required by the contract. Therefore, if a jury found that the Board and Pfenninger were both negligent and that each of their respective negligent conduct constituted a proximate cause of the accident, then the jury would evaluate their conduct and apportion fault accordingly.

## IV

As modified, the judgment of the Appellate Division is affirmed. The matter is remanded to the Law Division for trial on plaintiff's claim that the Board's negligence in providing Pfenninger with nonconforming pipe was a proximate cause of his death. The Law Division is also ordered to provide Pfenninger with further discovery, consistent with this opinion, relating to Pfenninger's claim that the Board and O'Sullivan negligently supervised Pfenninger's company in the excavation and piping of the trench, such further discovery to be without prejudice to defendants' right to renew their motion for summary judgment on the issue of negligent supervision after such discovery has been provided.

So ordered.

Chief Justice PORITZ and Justices STEIN, LONG, and ZAZZALI join in this opinion. Justice COLEMAN filed a separate dissenting opinion in which Justices VERNIERO and LaVECCHIA join.

COLEMAN, J., dissenting.

I cannot join in the majority's opinion, which "give[s] plaintiff yet another bite of this thoroughly-chewed apple, ... [because] [t]he route to that result converts us from the Court of last resort,

to some sort of super rescue-mission." *Whitfield v. Blackwood*, 101 *N.J.* 500, 500-01, 502 *A.*2d 1132 (1986) (Clifford, J., concurring) (citation omitted). The majority has concluded that the trial judge abused his discretion in denying plaintiff's request for expanded discovery, and therefore remands this case. The Appellate Division rejected that claim. Yet, the majority's opinion reopens the discovery even though neither party has raised that issue before this Court. Ordinarily, this Court refrains from ruling on issues not raised in a petition or cross-petition for certification. In order to reopen the discovery, the majority's opinion has reinstated the dismissed complaint. Because I believe the majority has committed grievous error, I dissent.

I.

The present wrongful death cause of action was instituted by the decedent's spouse as the executrix of his estate. Prior to trial, defendants filed motions for summary judgment that were granted by the trial court. Consequently, I am compelled to accept plaintiff's version of the facts and give plaintiff the benefit of all favorable inferences. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995).

In 1994, Hunterdon Central Regional High School District Board of Education ("Board") commenced several construction projects at Hunterdon High School, including a drainage system, an underground electrical system, a new scoreboard, and renovation of the school's existing fountain. Although the Board hired multiple contractors to perform the various projects, it did not retain a general contractor. Responsibility for coordinating and scheduling the projects was shared by the Board and A.J. O'Sullivan Architects, P.A. ("O'Sullivan"), an architectural firm hired by the Board to provide architectural and engineering services.

The project involved in the present litigation involved the installation of a drainage system for the varsity baseball field. That required excavating an eight to nine-foot deep trench to install drainage piping underneath the field. O'Sullivan contacted

several excavating companies on the Board's behalf to solicit bids for the drainage project. The contract was ultimately awarded to Countywide Excavating, Inc. ("Countywide"), the owner and principal officer of which was the decedent, Matthew Pfenninger.

It was agreed that Countywide would supply labor and equipment and that the Board would supply the necessary materials, including the drainage pipe. According to the design specifications prepared by O'Sullivan, Countywide was "responsible for all safety precautions on the job." The design specifications also stated:

> The contractor shall furnish, place and maintain all sheeting, bracing, lagging, shoring and miscellaneous supports, as required to support and prevent movement of earth which could injure persons in or around the work areas, and/or endanger any adjacent structures, tanks or utilities....

> ... All preventive safety measures shall be in compliance with OSHA [3] and the requirements of the local municipality and the owner.

The design plans further specified that O'Sullivan did "not have field inspection responsibilities for the job" and that Countywide was "responsible for the methods and means of construction."

The Board's representatives were John Stana, director of plants and facilities, and Barry Imboden, supervisor of grounds and maintenance. Although Stana was the self-acknowledged liaison between the Board, O'Sullivan, and Countywide, he did not visit the athletic field after Countywide commenced the excavation project. Barry Imboden, on the other hand, was on campus daily and recalls having at least two conversations with Matthew Pfenninger after the project began. Imboden peered into the trench on occasion, but never saw it in a fully exposed state because Countywide "backfilled" completed sections of the trench with gravel before moving on to the next section.

---

[3] Unless excavating entirely in stable rock, the Occupational Safety and Health Administration ("OSHA") requires that trenches five or more feet deep "be protected from cave-ins by an adequate protective system." 29 *C.F.R.* § 1926.652(a).

O'Sullivan appointed Ken Quabeck as its project manager. Quabeck communicated with Countywide on several occasions after the excavation began. For example, Quabeck instructed Countywide that it would have to erect a temporary fence around the exposed trench during the project for the students' safety. Quabeck may have visited the excavation site once after the project commenced, but there is no evidence that he looked into the trench or was aware that Countywide was not using bracing or shoring. There is evidence that shortly before the trench collapsed O'Sullivan was aware that Countywide was having difficulty completing the excavation work due to inclement weather, machinery problems, and soil conditions. O'Sullivan frequently requested that the project commence and be completed as soon as possible.

The Board experienced some difficulty procuring the correct drainage pipe. O'Sullivan's design specifications called for perforated, corrugated pipe to be installed in the trench. Perforated pipe has holes in it to allow water to flow freely in and out of the pipe; corrugated pipe has alternating larger and smaller diameters to allow for flexibility. One advantage of corrugated pipe over non-corrugated pipe is that sections of corrugated pipe can be connected on the surface and then lowered into a trench. Non-corrugated pipe, on the other hand, is solid and requires a person to enter the trench to connect two or more sections.

The first set of pipes ordered by the Board from Aaron & Co. was neither perforated nor corrugated. That may be due to the fact that Countywide had supplied the Board with a written order for materials that omitted any reference to perforated or corrugated pipe. In any event, Matthew Pfenninger rejected the pipes, although it is not clear whether he did so because they were non-perforated, non-corrugated, or both. An employee at Aaron & Co. recalls that Matthew Pfenninger returned the pipe because it was not perforated. This corresponds with a handwritten note on the purchase order indicating that the pipe was not suitable for installation because it did not have holes.

A second order for pipes, this time placed by the Board with the Modern Concrete Septic Tank Co., resulted in the delivery of pipes that were perforated, but not corrugated. Notwithstanding the fact that the pipes did not comply with the contract specifications, Matthew Pfenninger proceeded to install the second set of non-corrugated pipes. Because the pipes were non-corrugated, Matthew Pfenninger was required to enter the trench to connect sections of the pipe.

On August 24, 1994, Matthew Pfenninger was working in the trench when the walls suddenly caved in and killed him. The walls were not braced or shored at the time of the accident as required by the contract.

Nearly two years later, Matthew Pfenninger's widow filed this wrongful death action. After the lawsuit got underway, plaintiff filed a motion seeking to expand the scope of discovery to include other construction projects at the school in progress around the time of the trench collapse. The motion judge denied that request, concluding that expanding discovery would be unduly burdensome and was not reasonably calculated to lead to admissible evidence.

Thereafter, plaintiff moved for summary judgment seeking to impose a duty of care on the Board and O'Sullivan. The Board and O'Sullivan filed cross-motions for summary judgment, arguing that they owed decedent no duty of care. The trial court granted summary judgment for defendants and dismissed the complaint.

Plaintiff filed an appeal challenging the discovery and summary judgment rulings. The Appellate Division reversed the summary judgment ruling, concluding that the Board and O'Sullivan each owed Matthew Pfenninger a duty of care. The Appellate Division affirmed, however, the trial judge's order denying plaintiff's request for expanded discovery, noting: "We have considered the contentions raised in connection with these orders and find them to be without merit and find no abuse of discretion on the part of the motion judge."

The Board and O'Sullivan filed separate petitions for certification seeking review of the Appellate Division's ruling on the duty of care issue. The Court granted both petitions. 165 *N.J.* 136, 754 *A.*2d 1212 (2000); 163 *N.J.* 78, 747 *A.*2d 286 (2000). Plaintiff did not file a cross-petition for certification with this Court.

## II.

At the outset of its opinion, the majority announces that one of the issues presented on appeal is "whether the trial court abused its discretion in denying plaintiff's request for discovery of other documents involving O'Sullivan's responsibility to the Board on related construction projects." The majority is mistaken. Neither party has raised the discovery issue before this Court. Plaintiff was entitled to file a cross-petition for certification under *Rule* 2:2–5(b), but elected not to do so. Presumably, plaintiff was content to proceed to trial on the existing record. Not surprisingly, defendants' petitions for certification are directed only toward the Appellate Division's ruling on the question of whether they owed Pfenninger a duty of care. Consequently, whether the trial judge abused his discretion in denying plaintiff's expanded discovery request is not an issue properly before this Court.

As a general rule, the Court will not rule on issues that were not raised in the petition for certification. *Hirsch v. New Jersey State Bd. of Med. Exam'rs*, 128 *N.J.* 160, 161, 607 *A.*2d 986 (1992) (declining to rule on issue raised for first time after petition for certification was granted); *Toms River Water Co. v. New Jersey Bd. of Pub. Util. Comm'rs*, 82 *N.J.* 201, 206 n. 5, 412 *A.*2d 430 (1980) (same); *State v. Davis*, 68 *N.J.* 69, 87, 342 *A.*2d 841 (1975) (Pashman, J., dissenting) (same). Likewise, the Court will not address issues raised by a respondent in the absence of a cross-petition for certification. *State v. Oliver*, 133 *N.J.* 141, 160, 627 *A.*2d 144 (1993) (refusing to address issue not raised by respondent in cross-petition for certification); *Skulski v. Nolan*, 68 *N.J.* 179, 208, 343 *A.*2d 721 (1975) (restating the Court's reluctance to

rule on issues raised by respondents in absence of cross-petition for certification).

I acknowledge that the Court has the power under *Rule* 2:12–11 to address issues not raised in a petition for certification, but we have traditionally exercised that authority sparingly. In *State Farm Mutual Automobile Insurance Co. v. Zurich American Insurance Co.*, 62 *N.J.* 155, 299 *A.*2d 704 (1973), for example, the plaintiff filed an action seeking a declaration of insurance coverage on two separate insurance policies following an auto accident. *Id.* at 161, 299 *A.*2d 704. The trial judge ruled that the driver of the automobile was not covered under either of the two policies and the Appellate Division affirmed. *Id.* at 162–64, 299 *A.*2d 704. The defendants then filed a notice of petition for certification seeking review of the "final judgment" of the Appellate Division. *Id.* at 161, 299 *A.*2d 704. The actual petition, however, focused exclusively on the construction given to one of the policies by the Appellate Division. *Ibid.*

At oral argument, a dispute arose "as to whether the liability of both insurers was properly before th[e] Court." *Ibid.* The Court instructed the parties to argue the merits of assigning liability under either policy, but reserved decision on whether the liability of both insurers was properly before the Court until both parties had an opportunity to submit supplemental briefs on that question. *Ibid.*

The Court ultimately decided to determine the liability of both insurers, but it gave explicit reasons for doing so. *Id.* at 165, 299 *A.*2d 704. The Court explained that deciding the liability of the second insurer was warranted because: (1) "the interests of a fair resolution of the entire controversy" militated in favor of deciding the second insurer's liability; (2) "one of the issues in relation to [the first insurer's] liability [was] identical with that involved under the [second insurer's] policy"; and (3) the plaintiff was not prejudiced because it had been served with the notice of petition and had "been afforded full opportunity to be heard on the merits." *Ibid.*

Applying the *State Farm* factors to the present case leads to the inescapable conclusion that this Court should refrain from deciding whether plaintiff is entitled to further discovery. Whether the Board and O'Sullivan owed Pfenninger a duty of care is entirely distinct from whether plaintiff is entitled to expanded discovery. In other words, they do not share an "identical issue." More importantly, the majority's decision to remand for further discovery unfairly prejudices the Board and O'Sullivan. In *State Farm*, a dispute arose at oral argument whether the liability of the second insurer was properly before the Court. The Court allowed the parties to argue the merits of the issue and directed the parties to submit supplemental briefs addressing whether the Court should rule on the second insurer's liability. Here, the issue of whether plaintiff is entitled to further discovery is raised for the first time before this Court in the majority's opinion. Although raised in and decided by the Appellate Division, the issue was not raised in a cross-petition for certification. Nor did plaintiff contend at oral argument before this Court that she was entitled to further discovery. To the contrary, plaintiff's attorney stated that he was "comfortable with the Appellate Division's decision" on the discovery issue. Furthermore, when all parties moved for summary judgment, each represented to the Court that the parties believed that no further discovery was required before ruling on the legal question of whether a duty was owed by the Board and O'Sullivan.

In conclusion, this is not one of the rare cases in which we are required in the interest of justice to address an issue that the parties did not raise before us. Therefore, I do not agree with the majority that the Court must decide whether the trial judge abused his discretion in denying plaintiff's request for further discovery.

### III.

The primary issue raised is whether the Board and O'Sullivan each owed Matthew Pfenninger a duty of care to protect against

the hazards of excavating a trench. The Board argues that it was merely the landowner, and as such, had no duty to guard against the ordinary risks of harm associated with the work a contractor was hired to perform. The Board contends that, although it coordinated the various construction projects, it did not exercise control over the performance of the work.

O'Sullivan argues that the Appellate Division failed to properly decide whether a duty existed as a matter of law. That argument is based largely on the court's statement that "there was enough in the summary judgment record to impose a duty of care sufficient to survive summary judgment." O'Sullivan maintains that a duty could be imposed upon it, absent a contractual obligation for safety, only if it had knowledge of an increased risk of harm beyond that entailed in performing the job.

The determination of whether a duty of care exists is a legal matter to be decided by the court and not the jury. *Clohesy v. Food Circus Supermarkets, Inc.*, 149 *N.J.* 496, 502, 694 *A.*2d 1017 (1997). Whether such a duty exists is a question of public policy and fairness. *Kuzmicz v. Ivy Hill Park Apartments, Inc.*, 147 *N.J.* 510, 515, 688 *A.*2d 1018 (1997). A critical ingredient in the duty analysis is the foreseeability of the risk of injury. *Carvalho v. Toll Bros. and Developers*, 143 *N.J.* 565, 572, 675 *A.*2d 209 (1996). The foreseeability component entails the balancing of several factors—"the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993).

## A. The Board

As a general rule, a landowner must exercise reasonable care to protect invitees against known or reasonably discoverable dangers on the premises. *Id.* at 441, 625 *A.*2d 1110. One well-established exception to the rule is that a landowner does not owe a duty to an independent contractor and its employees to protect against the very hazards posed by the work contracted to be performed. *Gibilterra v. Rosemawr Homes, Inc.*, 19 *N.J.* 166, 170, 115 *A.*2d

553 (1955); *cf. Bahrle v. Exxon Corp.*, 145 *N.J.* 144, 156, 678 *A.*2d 225 (1996) (explaining that employer is not ordinarily liable for tortious acts committed by independent contractor during performance of contract); *Baldasarre v. Butler*, 132 *N.J.* 278, 291, 625 *A.*2d 458 (1993) (same). One rationale for this exception is that an independent contractor, in contrast to the average employee, "contracts to do certain work according to his own methods, without being subject to the control of his employer except as to the product or result of his work." 5 *Am.Jur.2d Proof of Facts* § 219 (1975). An additional rationale is that independent contractors should be "sufficiently skilled to recognize the dangers associated with their task and adjust their methods accordingly to ensure their own safety." *Accardi v. Enviro–Pak Sys. Co.*, 317 *N.J.Super.* 457, 463, 722 *A.*2d 578 (App.Div.), *certif. denied*, 158 *N.J.* 685, 731 *A.*2d 45 (1999).

The exception to the general rule, however, is not absolute. A landowner owes a duty to an independent contractor and its employees to protect against the hazards of contracted work in three situations: (a) where the landowner participates in, actively interferes with, or exercises authority over the manner and means in which the contracted work is performed; (b) where the landowner hires an incompetent contractor; and (c) where the contracted work is inherently dangerous. *Majestic Realty Assocs. v. Toti Contracting Co.*, 30 *N.J.* 425, 431, 153 *A.*2d 321 (1959). In the present case, plaintiff only relies on exception (a), arguing that the Board controlled the means and methods of the excavation project and interfered with Countywide's work by furnishing the incorrect pipe. It is against this jurisprudential backdrop that we consider plaintiff's claim against the Board.

The experts in this case agree that the trench collapsed because the structural integrity of its walls was compromised by a high degree of moisture in the soil. Several days of rain and the field's high water table resulted in standing water in the trench. In light of those facts, we have little difficulty concluding that Matthew Pfenninger's death was precipitated by the precise condition that

he was hired to correct, namely, the substandard drainage characteristics of the athletic field. Therefore, the Board did not owe Matthew Pfenninger a duty of care unless it participated in or actively interfered with the excavation project.

It is undisputed that the Board did not retain the contractual authority to dictate the means by which Countywide was to install the drainage system. The design specifications state in the clearest of terms that Countywide was "responsible for the methods and means of construction" and that the "drawings are intended only as an outline for construction." The unmistakable import of this contractual language is that the Board and Countywide entered into a contractee-independent contractor relationship. As the Board had " 'no right of control over the manner in which the work [was] to be done, it is to be regarded as the contractor's own enterprise, and [Countywide], rather than the [Board] is the proper party to be charged with the responsibility for preventing the risk.' " *Baldasarre, supra,* 132 *N.J.* at 291, 625 *A.*2d 458 (quoting W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 71 (5th ed. 1984)).

I acknowledge that the Board reserved, under the design specifications, "the right to designate the order in which the Contractor shall proceed with any and all portions of the work." Under the first *Majestic Realty* exception urged here, if the landowner-contractee "gives directions for the work, ... or retains control over any part of it, he is required to exercise reasonable care for the protection of others; and he must likewise interfere to put a stop to any unnecessarily dangerous practices of which he becomes informed." *Mavrikidis v. Petullo,* 153 *N.J.* 117, 134, 707 *A.*2d 977 (1998) (quoting *Prosser & Keeton, supra,* § 71 (footnotes omitted)). Nonetheless, landowners may retain a limited degree of supervisory control over an independent contractor without exposing themselves to tort liability. *Id.* at 135, 707 *A.*2d 977; *Majestic Realty, supra,* 30 *N.J.* at 431, 153 *A.*2d 321. The Board's ability to direct the order in which the work was to be performed "relate[d] to the result to be accomplished, not to the means of

accomplishing it." *Majestic Realty, supra,* 30 *N.J.* at 431, 153 *A.*2d 321.

The absence of contractual authority notwithstanding, it must be determined whether the Board participated in or actively interfered with the excavation project. Plaintiff argues that the Board participated in the project because its agents were physically present at the campus on a daily basis and occasionally conversed with Matthew Pfenninger. I disagree and conclude that such conduct does not exceed the scope of general supervisory powers permitted a landowner-contractee. There is no evidence of the Board's active participation in the excavation project. Just as a family may occasionally visit the lot where its new home is being built and indicate that something is not in accord with the contract without triggering a duty of care to the builders, so may a commercial landowner have its agents present on site without subjecting itself to a duty of care to the independent contractors or their employees. In both instances, the landowner-contractee is inspecting the progress of the work to ensure compliance with design specifications. The fact that the Board's agents were physically present on a daily basis whereas a family might only appear at the construction site once a week is a difference in degree, not in kind. A landowner-contractee's on-site presence, whether continual or seldom, does not equate to participation or interference. To impose liability upon the landowner, there must be evidence of physical control over the work site; mere superintendence to ensure that the contractor is abiding by the agreement does not suffice. "When the evidence is viewed in the light most favorable to plaintiff[ ] [the Board's] actions arose from a general supervisory power over the result to be accomplished rather than the means of that accomplishment." *Mavrikidis, supra,* 153 *N.J.* at 136, 707 *A.*2d 977.

Relying on *Wolczak v. National Electric Products Corp.,* 66 *N.J.Super.* 64, 168 *A.*2d 412 (1961), plaintiff further contends that the Board interfered with the project when it delivered the incorrect pipe to Countywide. This argument is not supported by

the record. Although O'Sullivan's design specifications called for corrugated/perforated pipe, Countywide submitted a list of materials to the Board that only mentioned "poly" pipe without any reference to corrugation or perforation. Moreover, an employee from Aaron & Co., the plumbing supply company that delivered the first shipment of pipes, testified that Matthew Pfenninger returned the pipes because he needed pipe with "holes in it." That statement is particularly telling because the first set of pipes was neither corrugated nor perforated, yet Matthew Pfenninger only complained about the lack of perforation. That may also explain why he did not reject the second set of pipes, which was perforated, but not corrugated. Because decedent treated the perforated pipes as an amendment to the specifications, not even he thought there was an interference with the project. He knew immediately that the non-corrugated pipes required entrance into the trench to connect them.

In *Wolczak, supra,* the plaintiff-subcontractor alleged that the landowner refused his request to erect a scaffold. *Id.* at 74, 168 A.2d 412. The plaintiff was subsequently injured when he fell from a ladder while drilling a hole in a steel beam. *Id.* at 69, 168 A.2d 412. I readily agree that the allegation set forth in *Wolczak*, if true, is evidence of "active interference" because the subcontractor and landowner in that case disagreed over the means and methods of the project, and the landowner insisted that his method be followed. The same cannot be said of the present case. There is no evidence in the record that Matthew Pfenninger requested, but was refused, corrugated pipe.

Although OSHA imposes a non-delegable duty on an "employer" to provide a safe workplace, the Board is exempt from complying with OSHA regulations governing workplace safety. 29 *U.S.C.A.* § 652(5) ("The term 'employer' ... does not include ... [a] political subdivision of a State."); *see also* 29 *C.F.R.* § 1975.5(e)(1) (listing municipal public school board as example of entity not covered by OSHA regulations). Furthermore, the Court recently held that even when OSHA regulations are applicable and have

been violated, such a violation does not establish a *per se* breach of duty of care. *Alloway v. Bradlees, Inc.*, 157 *N.J.* 221, 236, 723 *A.*2d 960 (1999).

To summarize, the Board did not owe Matthew Pfenninger a duty of care because the accident occurred as a result of the operational hazards that are inherent to excavating a trench. I also find that the first *Majestic Realty* exception has not been met because the Board did not participate in, or actively interfere with, the excavation project. Absent a duty of care, the Board is absolved of liability for Matthew Pfenninger's death.

## B. O'Sullivan

In an attempt to impose liability on the architect, plaintiff relies on the Court's discussion of an engineering firm's duty of care to an independent contractor in *Carvalho, supra,* 143 *N.J.* 565, 675 *A.*2d 209. In *Carvalho,* the Township of West Windsor hired an engineering firm to prepare plans for a sewer construction project. *Id.* at 569–70, 675 *A.*2d 209. Although the general contractor was responsible for safety measures and the methods of construction, the engineer was contractually required to maintain an on-site representative, who was to monitor work progress and ensure that the construction complied with the design specifications. *Id.* at 570–71, 675 *A.*2d 209. To this end, the engineer's on-site representative had the contractual authority to stop construction. *Id.* at 571, 675 *A.*2d 209. An excavation subcontractor's employee was killed when the trench in which he was working collapsed. *Id.* at 571–72, 675 *A.*2d 209. Notwithstanding the fact that the contract required excavation protection systems, the trench was not shored or braced at the time of the accident. *Id.* at 570, 572, 675 *A.*2d 209. Notably, the engineering firm's on-site representative was standing near the trench on the day of the accident, observing the decedent perform his work. *Id.* at 572, 675 *A.*2d 209.

The decedent's widow sued the engineering firm, arguing that it owed the decedent a duty to provide reasonably safe premises. *Ibid.* The Court first determined that the accident was foresee-

able because the contract provided for trench safety precautions and other trenches had previously collapsed at the construction site. *Id.* at 574, 675 A.2d 209. The Court then observed that it was fair to impose a duty on the engineer because it had assumed a contractual responsibility to monitor work progress and to ensure compliance with the design plans, which implicated safety concerns because the use of trench boxes would slow down the project. *Id.* at 575, 675 A.2d 209. The Court also stressed that the engineer "had the authority and control to take or require corrective measures to address safety concerns," when safety conditions affected work progress. *Id.* at 575–76, 675 A.2d 209. Finally, the Court emphasized that the engineer's representative was present at the job site on the date of the accident and had actual knowledge that work was being conducted in the trench without the protection of a trench box. *Id.* at 576–78, 675 A.2d 209. For all of those reasons, the Court concluded that imposing a duty to exercise reasonable care to protect against the risk of injury on the construction site was consistent with considerations of fairness and public policy. *Id.* at 577, 675 A.2d 209.

Relying on the Court's decision in *Carvalho,* plaintiff contends that O'Sullivan owed Matthew Pfenninger a duty of care because it was foreseeable that the trench walls could collapse. I agree that there is a risk in nearly every excavation project that the walls of an unshored trench may cave in. Those who doubt this statement need only canvass New Jersey's case law, which is replete with lawsuits arising from trench collapses. *See, e.g., Carvalho, supra,* 143 *N.J.* at 569, 675 A.2d 209; *Gibilterra, supra,* 19 *N.J.* at 169, 115 A.2d 553; *Rocco v. F.A. Gillespie Co.,* 73 *N.J.L.* 591, 591, 64 A. 117 (E. & A. 1906); *Van Steenburgh v. Thornton,* 58 *N.J.L.* 160, 160, 33 A. 380 (E. & A. 1895); *Costantino v. Ventriglia,* 324 *N.J.Super.* 437, 439, 735 A.2d 1180 (App. Div. 1999), *certif. denied,* 163 *N.J.* 10, 746 A.2d 456 (2000); *Mudri v. United Eng'rs & Constructors, Inc.,* 11 *N.J. Misc.* 273, 273, 165 A. 283 (Sup. Ct. 1933), *aff'd,* 112 *N.J.L.* 17, 169 A. 288 (E. & A. 1933); *Regan v. Palo,* 62 *N.J.L.* 30, 31, 41 A. 364 (Sup. Ct. 1898); *Horton v. American Inst. for Mental Studies,* 154 *N.J.Super.* 121, 122, 380 A.2d 1201 (Law Div. 1977); *Atlantic Mut. Ins. Co. v. Continental*

*Nat'l Am. Ins. Co.*, 123 *N.J.Super.* 241, 243, 302 *A.*2d 177 (Law Div.1973).

The risk of a cave-in can be eliminated, however, through the use of adequate protection systems, such as bracing, shoring, or trench boxes. Therefore, plaintiff is not correct that it was foreseeable that the walls would collapse on Matthew Pfenninger. O'Sullivan, like the engineering firm in *Carvalho*, inserted a clause into the design specifications requiring Countywide to adequately brace or shore the trench. In contrast to an unbraced trench, it is not foreseeable that a braced trench will collapse. Nor did O'Sullivan have reason to believe that Countywide would deviate from the design specifications and fail to secure the trench walls with a protection system.

The same can be said, of course, about the engineer in *Carvalho*. The critical difference, however, is that the engineer in *Carvalho* was contractually required to maintain an on-site representative who had the authority to ensure compliance with safety requirements and to stop the work, if necessary, to ensure compliance. Furthermore, the engineer's representative in *Carvalho* was observing the decedent work in the trench at the time of the accident, and was, therefore, aware that neither a trench box nor any other safety system was being used.

O'Sullivan, in contrast to the engineer in *Carvalho*, was neither required to maintain an on-site representative nor did it have the authority to halt the project to remedy safety violations. The design specifications explained that O'Sullivan did not have "field inspection responsibilities" and that Countywide was "responsible for safety precautions on the job." An architect's duty to foresee and prevent harm is generally "commensurate with the degree of responsibility which the engineer [or architect] has agreed to undertake." *Sykes v. Propane Power Corp.*, 224 *N.J.Super.* 686, 694, 541 *A.*2d 271 (App.Div.1988). Furthermore, the summary judgment record lacks evidence that O'Sullivan, or the Board for that matter, had actual knowledge that Countywide failed to brace

the walls of the trench.[4] Although O'Sullivan's project manager, Ken Quabeck, visited the excavation site at least once, there is no competent evidence in the record establishing that he looked into the trench or was told that the walls were not braced. Absent contractual responsibility for on-site safety and actual knowledge that the trench was not braced, O'Sullivan could not foresee that the trench would cave in on Matthew Pfenninger.

I agree with O'Sullivan that expanding an architect's or engineer's liability as the Appellate Division did in this case will obligate architects to force independent contractors to use trench bracing even if the contractor objects. Such an extension of liability would be contrary to the public policy expressed by the Legislature in *N.J.S.A.* 2A:29B-1 when it codified *Carvalho, supra,* thereby intending to preclude any further expansion of engineers' liability regarding construction-site safety.

## IV.

I also disagree that plaintiff should be permitted to proceed to trial on the theory that the Board proximately caused decedent's death by negligently supplying the wrong pipe. A lugubrious recitation of the general law of negligence cannot camouflage the reality that the facts in this case do not give rise to a theory of liability.

It is undisputed that the pipes Pfenninger was installing at the time of his death were not the pipes listed in O'Sullivan's design specifications. More importantly, it is not disputed that Pfenninger knew the pipes he was installing were not those required by the contract. Pfenninger had every right to insist that the Board supply him with corrugated pipe, but when he knowingly and

---

[4] As I mentioned earlier, Barry Imboden looked into the trench, but never saw it in a fully exposed state because Countywide filled completed sections of the trench with gravel before digging a new section. Because Mr. Imboden never observed a fully exposed trench, he presumably could not have known that Countywide was not using bracing or shoring.

purposely decided to install the non-corrugated pipe with the Board's approval, that constituted an implied-in-fact amendment to the contract. An implied-in-fact contract "arises from mutual agreement and intent to promise, when the agreement and promise have simply not been expressed in words." 1 Richard A. Lord, *Williston on Contracts* § 1.5 (4th ed. 1990). While this amendment to the contract entitled Pfenninger to be compensated for any additional labor or equipment costs associated with the installation of non-corrugated pipes, it did not relieve him of his contractual duty to maintain bracing in the trench. Under those circumstances, the landowner has no duty to protect the contractor and its workers from the very hazards posed by the work to be performed under the contract as amended to install non-corrugated pipes. After Pfenninger agreed to install non-corrugated pipes, it was left to him how to install those pipes without being subject to the control of the Board. He should have been "sufficiently skilled to recognize the dangers associated with [the] task and adjust [his] methods accordingly to ensure [his] own safety." *Accardi, supra,* 317 *N.J.Super.* at 463, 722 *A.*2d 578.

Furthermore, the experts agree that the installation of the non-corrugated pipe did not cause the accident. The unsupported trench collapsed because the structural integrity of its walls was compromised by a high degree of moisture in the soil. Thus, the decedent's death was precipitated by the condition he was hired to remediate. In any event, there is evidence in the record that decedent was required to enter the trench regardless of which pipe was used because the design specifications called for perpendicular "T" connections, which could only be installed manually once the pipe was laying at the bottom of the trench. That alone speaks volumes about the necessity for decedent to brace the trench even if corrugated pipes were being installed at the time of the accident.

The fact that the Board wanted the job completed prior to the first day of school is not probative of the Board's alleged liability for negligently providing the wrong pipe. Landowners regularly

remind hired contractors about the importance of finishing a project on schedule. More importantly, this is not a case in which a landowner insisted on expediency at the sake of safety. Although Ken Quabeck inquired on several occasions about County-wide's progress, he never implied to Pfenninger that he should stop bracing the trench so that the pipe could be installed more quickly. In fact, Quabeck did just the opposite when he insisted that the trench be enclosed by fencing.

Finally, supplying the wrong pipe under the facts of this case was not the proximate cause of decedent's death. Ordinarily, proximate cause should be decided by the factfinder. *Scafidi v. Seiler,* 119 *N.J.* 93, 101, 574 *A.*2d 398 (1990). That issue, however, may be removed from the factfinder in highly extraordinary cases "in which reasonable minds could not differ on whether that issue has been established." *Fluehr v. City of Cape May,* 159 *N.J.* 532, 543, 732 *A.*2d 1035 (1999). Applying the standard set forth in *Brill, supra,* 142 *N.J.* at 523, 666 *A.*2d 146, my review of the undisputed facts in this case persuades me to conclude that, as a matter of law, supplying non-corrugated pipe did not proximately cause decedent's death. I would therefore affirm the dismissal of the vague claim of negligence based on supplying the wrong pipe.

Justices VERNIERO and LaVECCHIA join in this opinion.

*For affirmance as modified/and remandment*—Chief Justice PORITZ and Justices STEIN, LONG and ZAZZALI—4.

*For reversal*—Justices COLEMAN, VERNIERO and LaVECCHIA—3.