627 A.2d 144

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. LORENZO OLIVER, DEFENDANT-RESPONDENT.

Argued May 4, 1993—Decided July 22, 1993.

143

*Debra G. Lynch,* Assistant Prosecutor, argued the cause for appellant (*James F. Mulvihill,* Acting Essex County Prosecutor, attorney).

*Robert L. Sloan,* Assistant Deputy Public Defender, argued the cause for respondent (*Zulima V. Farber,* Public Defender).

The opinion of the Court was delivered by

CLIFFORD, J.

Defendant, Lorenzo Oliver, was convicted of sexually assaulting two women, A.S. and A.D., and of aggravated assault on A.S. Defendant and the victims had been close friends for many years and had grown up in the same neighborhood. Each assault involved remarkably similar circumstances: the attacker lured the victims into his third-floor room while other family members were downstairs; engaged in conversation with his victims; drank some beer; and then resorted to brute force to cut off the victims' air supply until they relented.

The trial court denied defendant's motion to sever the prosecutions arising out of the separate attacks on A.S. and A.D. At a joint trial, over defendant's objection the State offered the testimony of three other women who claimed that defendant had sexually assaulted them under similar circumstances. After a hearing pursuant to *Evidence Rule* 8, the trial court ruled the testimony admissible under *Evidence Rule* 55, apparently on the grounds that the similarity of the attacks showed a common scheme or plan and was relevant to defendant's intent.

In an unreported opinion a divided panel of the Appellate Division reversed and remanded, holding that the trial court's limiting instruction regarding the *Evidence Rule* 55 evidence had been inadequate and that the trial court had erred in not giving the jury a no-adverse-inference instruction regarding defendant's election not to testify. The dissenting judge believed that the *Evidence Rule* 55 limiting instructions had been adequate, and that the failure to instruct on defendant's decision not to testify, although wrong, amounted to harmless error. The State appeals as of right because of the dissent below. *R.* 2:2–1(a)(2). We affirm.

I

The State presented evidence tending to establish the following facts. A.S. and defendant had been close friends for twenty-six years; they had known each other from childhood and had grown

up in the same neighborhood. On the evening of June 2, 1988, defendant came to A.S.'s house to talk about "a case that was pending." Finding discussion there difficult because of the presence of many other people, A.S. left with defendant at about 8:40 p.m. to go to his home in Newark. On the way defendant stopped to buy beer.

Arriving at defendant's home, the two went upstairs to his third-floor room, where he customarily entertained guests and where A.S. had visited on many other occasions. Defendant's mother and niece were downstairs, on the first floor. With music playing in the background, defendant and A.S. talked for about an hour, during which time defendant drank three or four beers. A.S. testified that defendant insisted she also have a beer, but that she did not drink much of it. After about an hour, A.S. told defendant that she needed to go back home to her children, but defendant refused to take her home. After another forty-five minutes, A.S. rose to leave. Defendant asked her to let him finish his beer. He then walked over to her, turned out the light, and grabbed her from behind. She thought he was joking and told him to "cut it out" because she had to go home. Defendant, a 250–pound part-time martial-arts instructor, refused to release his hold. They struggled, falling to the floor. During the struggle, defendant became more aggressive, telling A.S., "I want you." A.S. screamed, and defendant, from his position on top of her on the floor, covered her nose and mouth and held her down with his body weight. Unable to breathe, A.S. stopped struggling and relaxed. Defendant then removed the pressure from her nose and mouth but did not let her up. When A.S. attempted to persuade defendant that he was ruining a twenty-six-year friendship, defendant replied that he did not care. At one point A.S. thought she had "gotten through to him," and she asked him to let her get up, promising that they would talk and that she would not run.

A.S. stood up, picking up her bracelet, which had been broken in the fall. Almost immediately, the two began to fight again. During that struggle A.S. attempted to "dig [defendant's] eyes out" with a broken piece of her bracelet and to scratch defendant's

face with her fingernails. Defendant bit A.S.'s fingers, causing a fracture and a pinched nerve. The two ended up on the bed, with defendant on top. He again covered A.S.'s nose and mouth with his hands and pressed down with his body weight. A.S., afraid she would die, stopped struggling. Defendant released the pressure. She said to him, "Okay, okay Lorenzo, you wanted it, you can have it, you can have it." Defendant thereupon proceeded to have vaginal intercourse with A.S.

After the sexual assault A.S. got up, picked up her underclothes, and headed downstairs. She was dishevelled and bloody. Although she saw defendant's niece in the living room, A.S. did not say anything. She went into the bathroom to dress. When defendant came downstairs, A.S. left the house but came back in and accepted a ride home from defendant because it was almost midnight and because she "didn't know where to go" and "didn't have any transportation."

Shortly after arriving home she reported the incident to the police, then went to University Hospital for treatment of her injured finger, in the course of which she told a nurse about the sexual assault. She then went to United Hospital because only that facility had kits for use in conducting sexual-assault examinations. There she gave a complete statement about the incident.

The second victim, A.D., was a longtime close friend of defendant and of A.S. as well. She had been trying to communicate with A.S. but had been unable to do so because A.S. had recently moved and A.D. did not know where to find her. On the evening of June 14, 1988, just twelve days after his assault on A.S., defendant visited A.D. at her home. Defendant told her that he had A.S.'s new telephone number at his home. When he asked A.D. to go there with him so he could give her the number, she complied.

Although A.D. "knew there were other people home," she did not see anyone. Defendant and A.D. went to defendant's room on the third floor, where defendant turned on music and drank some beer. He then left the room for a few minutes. When he

returned, he closed the bedroom curtain and grabbed A.D. A struggle ensued, during which defendant told her he "wanted" her and that she knew how much he wanted her. Defendant told A.D. to "stop fighting him, it would only take three minutes." Defendant threw A.D. on the bed, pinned her down, and cut off her breathing by pressing his forearm against her throat. When defendant told his victim that he would let her breathe if she would "shut up" and stop fighting, she stopped struggling. He then attempted to have vaginal intercourse with A.D. but could not maintain an erection. A.D. asked him to "give up," but he proceeded to perform oral sex on A.D. Defendant drove A.D. home at about 1:30 a.m.

The State proffered the testimony of three other women, K.J., L.C.D., and J.A., who claimed to have been sexually assaulted by defendant in a similar manner. All the women had been defendant's friends; all had been lured to and attacked in his home, having gone there voluntarily at defendant's invitation for a non-sexual purpose; all had been given drugs or alcohol; all had been subdued and silenced by defendant's blocking their breathing; and all the attacks had occurred while other people occupied the house. Defendant had been tried and acquitted on charges relating to the sexual assault of L.C.D. At the time of this trial the charges concerning the sexual assault of K.J. were pending before a grand jury. After an *Evidence Rule* 8 hearing, the trial court ruled that the women could testify, apparently because the similarity of the attacks showed a common scheme or plan and was relevant to intent.

At the trial, the State presented the testimony of A.S., A.D., the police officer who had responded to A.S.'s call, L.C.D. and K.J., and the records clerks from the two hospitals at which A.S. had been treated. J.A. did not testify. The defense presented, among other witnesses, four of defendant's relatives who resided with him, all of whom testified that they had not seen or heard anything unusual on the nights in question. Defendant did not testify, stating for the trial record that he did not want his prior convictions to be disclosed on cross-examination. Defendant also

chose not to have the jury instructed that he had the right not to testify and that no negative inference could be drawn from his exercise of that right. After the closing arguments, but before the court began its charge to the jury, defendant changed his mind and asked that the jury be charged not to draw any adverse inference from his decision not to testify. The court responded tersely, "Too late. Tell him too late." Out of the jury's presence, the court explained its ruling by saying, "[Y]ou told me you didn't want it. One shot at the apple in my court."

A jury convicted defendant of the sexual assault and criminal restraint of both A.S. and A.D. under *N.J.S.A.* 2C:14–2c(1) and *N.J.S.A.* 2C:13–2 respectively; the aggravated assault of A.S. in violation of *N.J.S.A.* 2C:12–1b(1); and the attempted sexual assault of A.D., contrary to *N.J.S.A.* 2C:14–2c(1) and *N.J.S.A.* 2C:5–1. The court imposed an extended term of twenty-years imprisonment with seven years of parole ineligibility for the aggravated assault of A.S.; a consecutive ten-year term at the Adult Diagnostic and Treatment Center with a five-year parole disqualifier for the sexual assault of A.S.; and a consecutive eight years at the Center for attempted sexual assault of A.D., all other terms concurrent.

In reversing and remanding for a new trial, the majority below relied primarily on *State v. Cofield*, 127 *N.J.* 328, 605 *A.*2d 230 (1992), and *State v. Stevens*, 115 *N.J.* 289, 558 *A.*2d 833 (1989), as support for its holding that the "other crimes" instruction had been prejudicially inadequate. The Appellate Division further held that although the other-crime evidence might be admissible to prove the feasibility of rape under the circumstances alleged, namely, in defendant's home with other family members on the premises, and to demonstrate defendant's successful use of pretext, the trial court had erred in admitting the testimony of K.J. and L.C.D. to show a common plan or scheme within *Evidence Rule* 55. It therefore instructed the trial court to reconsider on remand the admissibility of the other-crime evidence as well as defendant's motion for severance in light of the Appellate Division's no-common-scheme determination. The court warned, how-

ever, that whatever grounds for admission might be used, the limiting instruction required by *Evidence Rule* 6 should be detailed and specific.

Although the State seeks to raise five issues in its appeal, we confine our disposition to those issues posed by the dissent below. See *Rule* 2:2–1(a)(2) (limiting appeal as of right based on dissent below to issues raised by dissent).

## II

### A. Severance and the Admissibility of Other–Crimes Evidence Under *Evidence Rule* 55.

Defendant made a pre-trial motion under *Rule* 3:15–2(b) to sever counts one, two, and three, involving the alleged June 2, 1988, incident with A.S., from counts four, five, and six, involving the alleged June 14, 1988, events with A.D. In denying the motion for severance the trial court appears to have credited the State's argument that the similarity of the assaults established defendant's intent to commit crimes against those women, and/or established his common scheme or plan to lure female friends to his room under false pretenses, block their air intake to suppress resistance and outcry, and then sexually assault them; therefore, if separate trials were held, evidence of the severed charges would be admissible at the trial on the remaining charges. Although the Appellate Division did not base its reversal of defendant's conviction on the denial of the motion for severance, it did order that the trial court reconsider its decision in light of the court's holding that the other-crime evidence "did not demonstrate a common plan or scheme within the meaning of *Rule* 55."

 In the context of this case, because the questions of whether a severance should have been granted and whether other-crime evidence should have been admitted are inextricable, the "severance" issue is properly before us. *Rule* 3:15–2 gives a trial court the discretion to order separate trials on counts of an indictment if a party is prejudiced by their joinder. Central to

deciding whether joinder is prejudicial is "whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under *Evidence Rule* 55 in the trial of the remaining charges." *State v. Pitts*, 116 *N.J.* 580, 601–02, 562 *A*.2d 1320 (1989). We hold that defendant would not be prejudiced by joinder because, as we shall demonstrate, evidence of the severed offenses would be admissible under *Evidence Rule* 55 on the questions of the feasibility of committing the assaults, defendant's use of pretext, and defendant's intent, *i.e.*, whether he actually believed that the victim had freely and affirmatively given him permission for penetration.

*Evidence Rule* 55 states that

evidence that a person committed a crime or civil wrong on a specified occasion[ ] is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion[,] but * * * such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.

The *Rule*'s list of issues for which other-crime evidence may be admissible is not intended to be exclusive. *Stevens, supra,* 115 *N.J.* at 300, 558 *A*.2d 833. Subject to the "probativeness/prejudice" balancing test of *Evidence Rule* 4, other-crime evidence may be admitted under *Evidence Rule* 55 when that evidence bears on any fact genuinely in issue. *Id.* at 301, 558 *A*.2d 833. An important factor in weighing the probative value of other-crime evidence is whether other, less-inflammatory evidence can prove the same fact in issue. *Id.* at 303, 558 *A*.2d 833. The party wishing to introduce the other-crime evidence must also establish by clear and convincing evidence that the other crime did in fact occur. *Cofield, supra,* 127 *N.J.* at 338, 605 *A*.2d 230.

This Court considered the "plan" rationale for admissibility of other-crime evidence in *Stevens, supra,* 115 *N.J.* 289, 558 *A*.2d 833. In that case a police officer was charged with subjecting female arrestees to inappropriate strip searches for his own sexual gratification on two separate occasions about one month apart. *Id.* at 294–95, 558 *A*.2d 833. The trial court admitted the testimony of three other women whom the defendant had subjected to sexual

advances or inappropriate strip searches. This Court ruled that the other-crimes evidence could not be used to show a "common plan, design or scheme" by the defendant to exploit his position as a police officer to intimidate helpless females if they did not submit to degrading sexual acts. We explained that

> more is required to sustain a ruling admitting such [other-crime] evidence than the incantation of the illustrative exceptions contained in the Rule. Thus, the "plan" example contemplates more than a strong factual similarity between the "other crimes" and the indicted offense. The "plan" example refers to instances in which the other-crime evidence proves the existence of an integrated plan, of which the other crimes and the indicted offense are components. As we observed in *State v. Louf,* 64 *N.J.* 172, 178 [313 *A.*2d 793] (1973): "[W]here such [other crime] evidence tends to establish the existence of a larger continuing plan of which the crime on trial is a part, it is admissible for such purpose." [115 *N.J.* at 305–06, 558 *A.*2d 833.]

The Court ruled that although the other-crime evidence presented at Stevens's trial did not establish the existence of an integrated plan or scheme, it was admissible to show intent. *Id.* at 306, 558 *A.*2d 833.

■ The Appellate Division's conclusion in this case that the facts do not show a common plan or scheme comports with *Stevens:* the two sexual assaults charged in the indictment and the three other sexual assaults proffered as other-crimes evidence are not bound together by any "integrated plan" or a "larger continuing plan of which the crime on trial is a part." They are simply discrete, albeit similar, acts.

The State argues that defendant had a "single purpose," thus satisfying the definition of "plan" under *State v. Zicarelli,* 122 *N.J.Super.* 225, 241, 300 *A.*2d 154 (App.Div.), *certif. denied,* 63 *N.J.* 252, 306 *A.*2d 455 *cert. denied,* 414 *U.S.* 875, 94 *S.Ct.* 71, 38 *L.Ed.*2d 120 (1973). The State asserts that defendant's single purpose was to have intercourse with A.S. and A.D. whether or not they consented, and that he had had the same single purpose with K.J., L.C.D., and J.A. on prior occasions.

The State's argument confuses having a "single purpose" binding together several crimes with having the same purpose several times. The problem is rooted in the ambiguity in the word

"purpose": it can mean a "goal" or an "end," and it can also mean "intent." Defendant might well have had the same purpose, meaning "intent," each time he committed sexual assault; but he did not commit each sexual assault to further some overall purpose in the sense of pursuing a single "goal."

In this case, no evidence suggests that defendant had any "integrated plan" of which the sexual assaults on A.S., A.D., K.J., and L.C.D. were components. Those separate assaults were not committed in furtherance of any ultimate goal. Therefore, the evidence of the other assaults should not have been admitted on the premise that it demonstrated a plan or scheme.

██ However, as the Appellate Division noted, the other-crime evidence would be admissible to show the feasibility of the proposition that defendant could sexually assault women in his room without other household members hearing or seeing anything unusual. That question was clearly a genuine issue in the case, inasmuch as the defense introduced the testimony of various household members that they had not heard any fighting or screaming on the evenings of the alleged assaults. As further observed by the Appellate Division, the testimony might be admissible as well to demonstrate defendant's successful use of pretext to lure women into his room. That issue too is genuine, because it would serve to negate the inferences of consent that might arise from the victims' voluntary presence in defendant's bedroom at night.

The State's argument that defendant's "single purpose" was to have sexual intercourse with the victims whether or not they consented raises the question of whether the evidence could be admitted to show defendant's intent. Although "intent" was not discussed by the Appellate Division as a basis for admission, it was argued by the prosecution and accepted by the trial court, as evidenced by the jury instructions.

██ *Evidence Rule* 55 expressly includes "intent" as one of the bases on which other-crime evidence can be admitted. However, other-crime evidence can never be admitted to prove a fact not

material to proof of the charged crime. *Stevens, supra,* 115 *N.J.* at 301, 558 *A.*2d 833. The question, therefore, is whether the defendant's intent is a fact in issue in a sexual-assault trial.

That question was answered in the negative in *State v. Hasher,* 246 *N.J.Super.* 495, 587 *A.*2d 1341 (Law Div.1991), in which the court discussed the two lines of cases on that issue:

> One line of cases holds that prior acts of forcible sexual assaults are admissible to prove the intent of defendant to commit a forcible sexual assault. The theory of these cases is * * * that when a defendant raises the defense of consent he necessarily disputes that his intent was to commit a forcible sexual act without the consent of the victim and, consequently, he places his intent in issue.
>
> On the other hand, there is a line of cases which holds such testimony inadmissible on the theory that once a defendant admits that he had sexual relations with the victim, but contends that it was with the consent of the victim, his intent is no longer in issue and the critical issue is what was the intent of the victim. If the victim consented, sexual relations could not have been against her will, no matter what defendant intended. Consequently, these cases hold that when defendant admits that he had sexual relations with the victim, what he said or did in a prior incident of alleged criminal sexual conduct with another person is irrelevant and must be excluded.
>
> We believe that the latter line of cases is the more persuasive because the thrust of rape or sexual assault laws focuses on whether the act was committed against the will of the victim. If the victim intended to voluntarily have sexual intercourse it would be a *non sequitur* to also conclude that the intercourse was against her will as the result of force or violence committed by defendant. [*Id.* at 501–02, 587 *A.*2d 1341 (citations omitted).]

We reject *Hasher's* conclusion that the second line of cases is more persuasive, because that conclusion is based on a view of sexual assault that this Court recently unanimously rejected in *In re M.T.S.,* 129 *N.J.* 422, 609 *A.*2d 1266 (1992).

█ In *M.T.S.,* Justice Handler explained that in enacting the 1978 Code of Criminal Justice the Legislature emphasized the affinity between sexual assault and other forms of assault and battery. *Id.* at 442–43, 609 *A.*2d 1266. The relevant portion of the sexual-assault statute defines the offense as follows:

> c. An actor is guilty of sexual assault if he commits an act of sexual penetration with another person * * * [and]:
> . (1) The actor uses physical force or coercion * * *; [*N.J.S.A.* 2C:14–2.]

This Court emphasized that the statute

> does not refer to force in relation to "overcoming the will" of the victim, or to the "physical overpowering" of the victim, or the "submission" of the victim. It does

not require the demonstrated non-consent of the victim. As we have noted, in reforming the rape laws, the Legislature placed primary emphasis on the assaultive nature of the crime, altering its constituent elements so that they focus exclusively on the forceful or assaultive conduct of the defendant. [129 *N.J.* at 442, 609 *A.*2d 1266.]

The Court determined that "any act of sexual penetration engaged in by the defendant without the affirmative and freely-given permission of the victim to the specific act of penetration constitutes the offense of sexual assault." *Id.* at 444, 609 *A.*2d 1266. Physical force in excess of that inherent in the act of penetration is not required to trigger the statute. *Ibid.* The Court thus determined that the State's burden in a sexual-assault trial is to

prove beyond a reasonable doubt that there was sexual penetration and that it was accomplished without the affirmative and freely-given permission of the alleged victim. ⁂ [S]uch proof can be based on evidence of conduct or words in light of surrounding circumstances and must demonstrate beyond a reasonable doubt that a reasonable person would not have believed that there was affirmative and freely-given permission. [*Id.* at 448–49, 609 *A.*2d 1266.]

When a defendant claims that the alleged victim gave permission for the penetration, the role of the jury is to determine "whether the defendant's belief that the alleged victim had freely given affirmative permission was reasonable." *Id.* at 448, 609 *A.*2d 1266. The jury is also entitled to determine whether the defendant actually held such a belief.

If there is evidence to suggest that defendant reasonably believed that such permission had been given, the State must demonstrate either that defendant did not actually believe that affirmative permission had been freely-given or that such a belief was unreasonable under all of the circumstances. [*Id.* at 449, 609 *A.*2d 1266.]

Applying *M.T.S.*'s explanation of sexual-assault law to the two lines of cases described in *Hasher*, we are persuaded that the first line of cases is more compatible with New Jersey law. When a defendant claims that he penetrated with permission, he puts his own state of mind in issue: he argues that he reasonably believed that the alleged victim had affirmatively and freely given him permission to penetrate. The State, therefore, can introduce evidence to disprove that the defendant had that state of mind. Equally clearly, the second line of cases described in *Hasher* — those that hold that when a defendant alleges permission, the

focus shifts to the victim's state of mind—is clearly inconsistent with New Jersey law. *M.T.S.* flatly rejects any such shift of focus, plainly holding that the focus is on the defendant's use of force and on the reasonableness of the defendant's alleged belief that the victim has given permission, not on the victim's subjective state of mind. *Id.* at 448, 609 *A.*2d 1266.

The inquiry into whether the defendant reasonably believed that the victim had consented entitles the fact finder to determine whether the defendant actually held such a belief. Therefore, under *M.T.S.* the defendant's state of mind is a material issue in a sexual-assault trial. Determination of that issue becomes especially significant in those situations in which the evidence suggests that the defendant could reasonably have believed that permission had been given. *See id.* at 449, 609 *A.*2d 1266. Therefore, because defendant's intent is a material fact in issue in this case, the other-crimes evidence can be admitted on retrial under *Evidence Rule* 55 to show defendant's intent when he committed the offenses.

However, although admissible under *Evidence Rule* 55 to demonstrate defendant's state of mind concerning whether he actually believed his victims had given permission or whether he intended to have sex with them whether or not they had given permission, evidence of past acts to show present state of mind raises problems in this case under *Evidence Rule* 4, because the prejudice to defendant seemingly far outweighs the limited probative quality of that evidence. Therefore, we strongly suggest that on remand the trial court limit the use of the other-crimes evidence to showing only the feasibility of the crimes and defendant's use of pretext.

B. The Adequacy of the Limiting Instruction.

At the close of the State's case, the trial court gave the following limiting instruction concerning the other-crimes testimony of K.J. and L.C.D.:

I alert you now specifically to the testimony of [L.C.D.], who testified before lunch and [K.J.] who testified after lunch, that their testimony vis-a-vis the activity with Mr. Oliver is submitted to you for a very limited purpose. Each of those witnesses testified as to certain acts done to them by this defendant on prior occasions.

Now, normally we do not allow evidence such as this either singly or together to be admitted in our courts of law. This is so because our Rules of Evidence specifically state that evidence that a person committed a crime on a prior occasion is inadmissible, not admissible. * * *

Therefore, you may not once you start deciding the case take that evidence and conclude from it that the defendant is a bad person, or has a disposition which shows that he's likely to have done this act which he is charged with in the case that you are hearing. Or to show a general disposition of the defendant to commit bad acts. This is not for the purpose of allowing the testimony and it should be, should not be considered by you as such.

Our Rules of Evidence do in certain situations permit such testimony where such evidence relates to some other fact in issue such as *intent or plan.* The evidence was admitted as it may bear on the issue of whether the alleged sexual assault had any similarities which you will determine for those two witnesses and how they roll one with the other for the two ladies who testified in chief designated as victims by our law.

Now, whether such item does in fact or doesn't in fact bear on the ultimate issue here, ladies and gentlemen, is for you and for you alone to decide. You notice how we leave the hard questions for you, and you may determine that the testimony does not bear on any of the issues, that is that it has no bearing or relationship to any of the issues to be decided by you.

In this event you may disregard the testimony as not being helpful to you at all, or you may consider such evidence bearing on one of those issues that I have just referred to. That is for you and you alone to decide. (Emphasis added.)

In charging the jury, the court referred to its earlier limiting instruction. Following a discussion of intent, it stated:

And at this juncture, ladies and gentlemen, I won't recharge you as to it. Remember I told you about the limited purpose of the testimony of the two ladies who are not victims in this indictment. That probably goes into that area as to whether you find there is some type of *intent or plan* by the defendant. You as jurors should find your facts from the evidence adduced during the trial. (Emphasis added.)

In *Cofield, supra,* we stated that when other-crime evidence is admitted under *Evidence Rule* 55, the limiting instruction should "narrowly focus the jury's attention on the *specific* use of other-crime evidence" rather than merely make "reference only to the generalities of the Rule." 127 *N.J.* at 341, 605 *A.*2d 230. *See also Stevens, supra,* 115 *N.J.* at 304, 558 *A.*2d 833 (stating that instruction "should be formulated carefully to explain precisely the

permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere"). The trial court in *Cofield* told the jury *not* to use the other-crime evidence to determine that the defendant had been predisposed to commit the crimes charged, but failed to instruct it clearly on exactly *how* to use the other-crime evidence. The court simply stated that " '[s]uch evidence is admissible and can only be considered by you, \* \* \* [for the] limited purpose of proving some other fact in issue.' " 127 *N.J.* at 333, 605 *A.*2d 230 (quoting trial court's charge). That instruction's lack of specific guidance on how to use the other-crime evidence allowed the jury "free rein" and constituted plain error justifying a reversal of the defendant's conviction. *Id.* at 342, 605 *A.*2d 230.

The charge given in the present case closely follows that quoted and approved in *State v. Cusick,* 219 *N.J.Super.* 452, 530 *A.*2d 806 (App.Div.1987). However, the significant difference is that the *Cusick* charge explained in greater contextual detail the permissible uses of the other-crime evidence:

> "The rules of evidence do[,] however, permit such testimony where such evidence relates to some other fact, where it relates to some other fact in issue here including motive, including intent, including absence of mistake, or accident, or some such other issue. Here the evidence was admitted as it may bear on the issue of whether the alleged touching of R.S. or K.S. was accidental or it was a mistake. Likewise, it might also bear on the defendant's motive for allegedly touching the victims here. This is to obtain some sort of sexual gratification, or on the issue of his intention to touch the children, victims here." [*Id.* at 466, 530 *A.*2d 806 (quoting trial court's charge).]

The trial court in *Cusick* did not state merely that the evidence could be used on the issues of intent, motive, or absence of mistake; rather, it explained those abstract issues in context and thus illustrated to the jury *how* it could apply the other-crime evidence to those issues for which the evidence had been admitted.

By contrast, the trial court in this case did not explain the relationship between the other-crime evidence and the issues and facts on which it could be considered. Although the court did clearly instruct the jury that it was not to use the evidence to

determine that defendant was a bad person or that he had been disposed to commit the crimes charged in the indictment, it did not clearly instruct the jury on how it could use the other-crime evidence. Precisely that situation prompted this Court to find reversible error in *Cofield.*

Although the instruction given in this case may not be as plainly erroneous as the one in *Cofield,* which instructed the jury to consider the other-crime evidence on "some other fact in issue," the trial court's instruction here is no more informative. It recites the bases—"intent or plan"—on which the evidence had been admitted, but unlike the *Cusick* instruction it fails to relate those abstract issues to the facts. This Court has stated that " 'more is required to sustain a ruling admitting such evidence than the incantation of the illustrative exceptions contained in the Rule.' " *Cofield, supra,* 127 *N.J.* at 341, 605 *A.*2d 230 (quoting *Stevens, supra,* 115 *N.J.* at 305, 558 *A.*2d 833).

The remainder of the instruction, to the extent that it can be understood at all, appears to admonish the jury to use the evidence to determine whether any similarities existed between the assaults testified to by K.J. and L.C.D. and those charged in the indictment. That use is not an independent basis for the admission of other-crime evidence under *Evidence Rule* 55, nor does the charge include an explication of what is meant by "intent" or "plan." As we have emphasized, "plan" contemplates more than a strong factual similarity between crimes. Inviting this jury to use the other-crime evidence "on the issue of whether the alleged sexual assault had any similarities" with the indicted assaults not only gave the jury free rein to use that evidence as it wished but implicitly gave the court's blessing to any such uses of the evidence.

C. The Refusal to Give the No–Adverse–Inference Charge.

Both the majority and the dissent below agreed that the trial court had erred in refusing defendant's request that the jury be charged not to draw any adverse inference from defendant's

exercise of his right not to testify. The dissent, however, considered that error harmless, noting that "many defendants, if not most, elect not to have the charge given, as they do not want the jury's attention called to the fact that they have not testified. Thus, * * * the failure to give the charge was harmless beyond any reasonable doubt." The majority disagreed, stating that

> [a]lthough not all constitutional error requires a reversal, we are not persuaded beyond a reasonable doubt that the court's failure to give the requested charge was harmless. Four women testified that defendant had lured them to his bedroom, overpowered them and raped them. An appropriate instruction regarding defendant's Fifth Amendment right not to testify and the invalidity of drawing an adverse inference from defendant's exercise of that right[ ] takes on an enhanced significance in the face of four uncontroverted accusations of rape. (Citations omitted.)

Because both the majority and dissent agreed that the trial court's refusal to give the charge was error, the issue of the propriety of that refusal (as opposed to its harmfulness) is not before us on appeal. The State nevertheless attempts to argue that the refusal was proper because defendant's request was untimely, and had defendant initially requested the charge, both parties would have summed up differently. The State not having raised that issue by cross-petition, we confine our consideration to the position of the dissenter below that the refusal amounted to harmless error. *R.* 2:2–1(a)(2). Given the gravity of charges and the severity of the sentence exposure, we agree with the majority below that the error was not harmless. *See Carter v. Kentucky,* 450 *U.S.* 288, 303, 101 *S.Ct.* 1112, 1120, 67 *L.Ed.*2d 241, 252 (1981) (stating that "[n]o judge can prevent jurors from speculating about why a defendant stands mute in the face of criminal accusation, but a judge can, and must, if requested to do so, use the unique power of the jury instruction to reduce that speculation to a minimum.").

## III

Judgment affirmed, cause remanded.

*For affirmance and remandment* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.