# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2209-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TRAVIS J. HARVEY,

      Defendant-Appellant.

_____

Submitted November 8, 2021 – Decided December 27, 2021

Before Judges Messano and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 17-08-2268.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele E. Friedman, Assistant Deputy Public Defender, of counsel and on the brief).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Kevin J. Hein, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Travis J. Harvey appeals from the February 21, 2018 order denying his severance motion, as well as the June 29, 2018 order denying his motion for reconsideration of the February 21 order. He contends that because he was indicted on discrete sets of offenses involving four victims, namely D.F., C.R., K.E. and M.M.,[1] he was unduly prejudiced by not having those charges tried separately. We disagree and affirm.

## I.

On May 24, 2017, the Bellmawr Police Department (Bellmawr P.D.) received a phone call from a person reporting that defendant sexually assaulted multiple women. The caller informed the police she did not know defendant or his victims personally but that her friend told her defendant sexually assaulted his cousin. Additionally, the caller advised the police that after she found defendant's public Facebook page, she reposted some of his posts on her own Facebook page.[2] Shortly thereafter, several victims contacted her and let her know defendant assaulted them.

---

[1] We use initials to protect the privacy of the victims. R. 1:38-3(c)(12).

[2] Defendant's Facebook posts included statements such as: "Working on legs [at the gym] . . . just in case the roofies wear off and a bitch wanna try to run"; "If she looks at you for more than [two] seconds she wants it, if she smiles at

About two hours after the police heard from the caller, D.F. arrived at the Bellmawr P.D. to report that defendant sexually assaulted her. D.F. referenced the caller's Facebook page and advised that when she realized defendant had sexually assaulted other women, she felt compelled to report what happened to her. Over the next two days, K.E., M.M. and C.R. also revealed to the Bellmawr P.D. that they were sexually assaulted by defendant. All four victims provided videotaped statements to the police about their experiences with defendant.

On May 26, 2017, defendant was transported to the Bellmawr P.D. for questioning. He, too, submitted to a videotaped interview with the police after waiving his Miranda[3] rights. We summarize the transcript of his police interview, as well as the transcripts of the victims' police interviews, to provide context for our opinion.

D.F.'s Interview

D.F. reported to the police that she met defendant online in February 2017. The two soon realized they lived within walking distance of one another and

---

you she wants it, if she says 'no please stop' she wants it, if she says 'I'm calling the police' she wants it[.] No means yes guys[.] . . . They all want it"; and "I've had my fair share of rapes." During defendant's police interview, he claimed "ninety percent" of these posts were satirical and for shock value.

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

started communicating, mostly through text messages. They met in person twice before D.F. received a call from defendant around 1:00 a.m. on March 5, 2017. She told the police she remembered that date because "that's the night that [defendant] raped [her]." During the call from defendant, he told D.F. he was heading to her apartment. She told him not to come over because she was tired from a fourteen-hour workday. Defendant repeated he was on his way to see her. She insisted he was not, and he replied, "yeah I am, watch me." Minutes later, defendant called D.F. from her doorstep, asking to be let inside. D.F. told him to go home, but he refused. She eventually let defendant into her apartment because she "felt bad" that it was cold outside.

According to D.F., once she let defendant into her apartment, he immediately started kissing her and tried to pull her sweatpants down. She claimed defendant "kept on trying to touch [her] and . . . trying to pull [her] pants down[,]" despite that she repeatedly told him to "stop." D.F. recalled she "kept on saying no," and was "trying to hold onto" her sweatpants "to keep them up." Nevertheless, defendant overpowered her, pulled her sweatpants down to her ankles, and began digitally penetrating her.

Defendant then tried to engage in oral sex with D.F. She attempted to "push his head up." After she repeatedly told defendant, "no[,]" "he wasn't

4

stopping [and] that's when [she] start[ed] getting scared." D.F. stated she "was panicking" particularly because she was "stuck on the couch" and could not access her phone. Defendant then pulled down his pants and mounted D.F. as she repeatedly tried to push him away. Defendant took "both of [her] hands in his one hand so [she] couldn't . . . fight him off[,]" and penetrated her vagina with his penis. D.F. stated she continued to try to move away from defendant and get up from the couch but "[e]very single time [she] tr[ied] to stand up, he'd push [her] right back down[,]" as she told him to stop. Defendant digitally penetrated D.F. again, at which point she managed to lift herself from the couch and "finally put through in his head that" she wanted him to stop. Shortly thereafter, defendant left her apartment.

D.F. told the police that once defendant departed, she sat on her couch "in shock" and cried. Defendant texted her and told her she "should really give him a chance." She responded "ok," but immediately "blocked his Snapchat and . . . blocked his Facebook." D.F. confirmed that defendant did not wear a condom during the assault.

C.R.'s Interview

C.R. reported to the police that defendant sexually assaulted her in his home on April 29, 2017. The two met through Facebook earlier that month and

after communicating by phone for approximately two weeks, C.R. agreed to meet defendant. She went to his home close to midnight on April 28. Defendant told her he took care of his sick mother, but C.R. did not meet his mother.

Upon C.R.'s arrival at defendant's home, he brought her upstairs to his bedroom to watch television. The two began kissing but defendant quickly started fondling C.R.'s breasts and vagina on top of her clothes. According to C.R., she repeatedly told defendant "no" and pushed his hands away, but he persisted. He placed his hand under her shorts, and she again pushed him away. Defendant mounted C.R., restrained both of her arms, and leaned over her so she could not move her legs. He said, "[O]h just let me put it in for one minute." C.R. repeatedly told defendant "no" and "stop, get off of me."

Defendant pulled C.R.'s shorts and underwear down and inserted his penis into her vagina. C.R. could not remember if defendant wore a condom during the attack, but she recalled telling him to "stop" at least fifteen times, and saying, "I'm not doing this, I don't wanna do this." C.R. also threatened to "punch [defendant] in [his] face," to which he responded, "oh come on." Because defendant ignored her repeated requests to stop, C.R. eventually "gave up" and "just laid there." When defendant was about to ejaculate, he pushed C.R.'s head towards his penis. She again resisted, and he ejaculated on the bed and floor.

A-2209-18

Thereafter, defendant said "girl, you know you wanted that" and "you know you liked that[.]"

C.R. slept at defendant's house for approximately two hours after the assault and left his home around 6:00 a.m. She explained she did not leave immediately because she was "shocked[,]" and it was so late at night. C.R. subsequently blocked defendant's phone number and social media accounts. She also disclosed the assault to her closest friends.

K.E.'s Interview

K.E. reported to the police that defendant sexually assaulted her on March 31, 2017. K.E. was sixteen when she met defendant on Facebook and he asked her out on a date. She declined the invitation. Defendant subsequently offered her a job as a receptionist at his office, so she gave him her cell phone number to pursue this opportunity. However, once defendant told K.E. that he expected her to perform sexual favors at the workplace in exchange for securing the position, she rejected the job offer.

Defendant and K.E. started communicating again in March 2017, by which time K.E. was nineteen years old. Defendant again asked K.E. out on a date, and this time, she accepted his invitation, agreeing to meet him at his home on March 31. Before she left for the date, K.E. told her mother that she was

7

concerned defendant might "expect[] something from [her]." K.E. reassured her mother she planned to say "no" if defendant made sexual advances toward her.

K.E. arrived at defendant's residence around 8:30 p.m. Defendant mentioned to K.E. that his brother "stayed" at the home, and that his parents owned the home. K.E. did not meet defendant's brother. After defendant and K.E. ate dinner, defendant brought K.E. upstairs to his bedroom to watch television. Roughly twenty minutes later, defendant tried to remove K.E.'s pants. She became "very nervous" and "froze up." She told defendant she was "not that type[,]" but defendant pulled K.E.'s shirt up and began kissing her hips. She told him "it's wrong[,]" "it's not right[,]" and "this is not what [she] came [there] for." She also "backed up" from defendant, but "didn't want him to . . . freak out . . . [because] he's . . . big [and] scary[.]"

Defendant knelt on the bed and kissed K.E.'s thighs and vagina. When K.E. told defendant she did not want to have sex, he responded, "I make the rules" and "I'm the boss." K.E. became afraid that "if [she] did deny [him] anything[,] he was going to get mad." She decided to "let him do what he . . . wanted to do[,]" noting she "didn't have . . . weapons on [her]." Defendant penetrated K.E. vaginally with his penis. K.E. recalled that defendant "turned [her] around" on the bed and "kind of just treat[ed her] like a rag doll."

A-2209-18

Defendant told K.E. that he wanted to ejaculate inside her and she responded, "there's no way you're doing that." He then told her she would have to perform fellatio. K.E. attempted to comply with his demand but could not continue because she "was about to throw up." She suggested defendant could climax on his own, to which he responded, "[N]o, I told you I make the rules[.]" Defendant vaginally penetrated K.E. again and ejaculated inside of her. K.E. told the police that defendant did not wear a condom during the incident because "he said [he] make[s] the rules."

After the assault, K.E. retreated to defendant's bathroom and texted her friend to tell her she was "just molested." K.E. asked her friend to call her back and fabricate an excuse so that K.E. would have to leave defendant's home. The friend complied, called K.E. minutes later, and asked K.E. to pick her up on the premise that her boyfriend had just beaten her. K.E. told defendant she would come back after she helped her friend, fearing defendant would react violently if she did not promise to return.

Once K.E. left defendant's home, she blocked him from her social media accounts. Subsequently, she was diagnosed at a local hospital with genital herpes and disclosed to hospital staff, her mother and her sister that defendant sexually assaulted her.

A-2209-18

M.M.'s Interview

Defendant was introduced to M.M. in March 2017. After briefly communicating through Facebook, the two agreed to meet at defendant's home on March 28. That evening, around 8:00 p.m., defendant brought M.M. upstairs to his bedroom to watch television. M.M. was initially seated on the edge of his bed, but defendant "grabbed [her] to cuddle with him." Soon, defendant kissed M.M., and touched her breasts and vagina over her clothes. M.M. told him to "stop [be]cause [she] didn't want that to happen," but he persisted. Defendant touched M.M. under her clothes, and again, M.M. told defendant to "stop," because she "didn't want to do this tonight."

M.M. tried to "control the situation" and "rolled on top of" defendant. He repeatedly tried to push her down and then "rolled back on top" of M.M. She told him she would not "have sex" with him. Nonetheless, he took her pants off and removed his own clothing. Defendant knelt in front of M.M.'s face, in an effort to have her perform oral sex on him. Although M.M. continued saying no to him, defendant attempted to penetrate M.M. vaginally. M.M. asked defendant to use a condom, which he did for a short period of time while penetrating M.M.'s vagina. Then, without asking her permission, defendant removed the condom and resumed intercourse until he ejaculated outside of her. M.M. stated

she was "shell-shocked" but got up, dressed, and walked out. She never spoke to defendant again. She also blocked him on her phone and Facebook.

Defendant's Interview

Defendant agreed to be interviewed by the Bellmawr P.D. on May 26, 2017. When questioned about D.F., C.R., K.E. and M.M., defendant did not dispute he engaged in sexual activity with them. But he denied assaulting them, maintaining each sexual encounter was consensual.

Defendant also specifically denied having sexual intercourse with D.F., claiming that instead, he digitally penetrated and performed oral sex on her with her consent. Regarding his sexual encounter with C.R., defendant insisted it "wasn't . . . something that was forced," even though C.R. initially told him she "didn't want to have sex . . . the first time [they] hung out." Defendant explained that he could not "obviously force someone to get on top of [him]" or to perform oral sex on him, adding, "when you're raping somebody[,] there's a position to be on top [and] she was all over the place." Additionally, defendant stated that when he digitally penetrated C.R., "the whole time she [was] still saying, 'no, we shouldn't do this . . . it's not right the first time we hang out,' but . . . as [he was] taking her shorts off, she [didn't] stop [him] . . . ." Defendant also recalled C.R. "slept next to [him] that night[.]" Further, he stated that the day after C.R.

11

came to his home, she sent him a message that she felt "semi-raped," but subsequently messaged him to say she "shouldn't [have] used that word, [rape,]" because she intended to say he was "too aggressive" in bed. Defendant explained to the police, "here's the thing, tell me to stop, then you know, . . . obviously, we'll stop. That's my thing[. 'W]e shouldn't do this['] and [']no I'm not gonna do this['] [are] two different things."

When describing his encounter with K.E., defendant acknowledged he met her through Facebook and began texting her. He recalled she sent him pictures of herself in a thong and he saved those pictures "to make sure [he] had evidence." Defendant stated he "had consensual sex with" K.E. while his brother was home. Additionally, defendant told the police that "it was implied [he and K.E. would] have sex, [be]cause she asked [him] what color panties to wear. So . . . if a girl is gonna ask you that, you['re] gonna have sex." When K.E. asked him for proof that he did not "have . . . AIDS or anything[, he gave] her [his] blood donor card." According to defendant, at that point, K.E. told him it was "okay" for him not to wear a condom.

Regarding M.M., defendant told the police that when she came to his home, the two started kissing on his bed, and "ha[d] sex, regular sex." He denied holding M.M. down during their encounter, stating, "she was . . . at one point on

12

top of me." He recalled using a condom during the encounter, but stated "then we agreed that we didn't have to use it." Defendant further disclosed he informed M.M., as well as D.F., C.R. and K.E., that he had herpes. He reported that once they knew of his condition, they, just like many other women he met, did not object to engaging in sexual activities with him.

Additionally, defendant stated during his police interview that he liked to "dominate in the bedroom," and was "into the daddy thing." Defendant explained this meant he was "in charge" when having sexual relations. He added that C.R. and K.E. referred to him as "daddy" during their encounters. Asked by the police, "when these girls tell you . . . [']I didn't come here for this['] or [']no stop['] or ['] I don't want to do this,['] . . . [a]t what point, do you think it's okay, to just continue to keep going?" Defendant replied, "[w]ell, if the girl didn't say [']no[,] stop.['] It's always like, [']oh well we shouldn't do this the first time.['] Well it's kind of like, . . . here's my whole thing. . . . [I]t's when they actually say, [']no[,] stop[']. That's when you stop, absolutely."

The police also asked defendant about his Facebook posts, noting some of them referenced how he was "forcing women to . . . have sex with [him]." Defendant acknowledged he could "see how it can be a problem[,]" but he defended the posts, explaining that "ninety percent [of the] things on [his

13

Facebook page] are satirical[,]" were "made for . . . shock humor[,]" and he did not "mean anything by it at all."

## II.

Defendant was indicted on nine counts of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), and four counts of fourth-degree infecting a person with a sexually-transmitted disease, N.J.S.A. 2C:34-5(a).[4] He subsequently moved to sever the charges, pursuant to Rule 3:15-2(b). Approximately one month before hearing the motion, the judge informed counsel she would watch the videotaped statements in the case and consider additional evidence defendant presented to her to challenge "the veracity or accuracy of the evidence" presented by the State. Defendant lodged no objection to the judge's pronouncement.

On February 21, 2018, the parties appeared for argument on the severance motion. In support of his application, defense counsel claimed that "the possibility of propensity inferences . . . is just so astronomical that [the charges have] to be severed, especially when there's plenty of other evidence that the

---

[4] Counts one through four pertained to D.F.; counts five through eight related to K.E.; counts nine through eleven involved M.M.; and counts twelve and thirteen referred to C.R.

State will be able to bring to show that there was sexual assault." The State argued against severance, noting defendant asserted a defense of consent and had suggested "in his [police interview] that at least some of the victims said [']no,['] but they didn't really mean it." The State posited joinder of the charges was appropriate because it's "more about the defendant's intent."

Following argument, the judge summarized each of the victim's videotaped statements. She acknowledged defendant denied having vaginally penetrated D.F., but that D.F.'s "statement indicate[d] something to the contrary." She also found defendant "admitted to the [police] that he had herpes," and that the victims "consented to having sex with him anyway." Moreover, the judge noted defendant "claimed he told [C.R., D.F. and K.E.] that he had herpes prior to having sex with them," and that when he informed M.M. "he had herpes," M.M. "agreed he could take the condom off to finish."

Citing to <u>State v. Cofield</u>,[5] the judge observed that the State needed to

> prove beyond a reasonable doubt this defendant committed the acts of sexual penetration without consent. This proof can be based on the conduct or words in light of surrounding circumstances and must demonstrate beyond a reasonable doubt that a reasonable person would not have believed that there was affirmative and freely given permission. If there is evidence that suggests that defendant reasonably

---

[5]  127 N.J. 328, 338 (1992).

believed such permission had been given, the State must prove that the defendant did not actually believe the affirmative permission had been freely given or that such belief [was] unreasonable under all the circumstances.

The judge further observed:

Defendant acknowledges in his brief that the first Cofield factor has been met because a defense to a sexual assault is consent[;] prior acts that tend to shed light on the defendant's mental state are relevant to the defendant's intent. That's from the defendant's brief at page [four].

The other[-]crimes evidence is relevant to the defendant's intent and mental state but not to prove that his purpose was sexual gratification.

In the present case, the other[-]crime[s] evidence is more relevant to the defendant's intent and mental state to prove an absence of mistake, accident, misunderstanding or misinterpretation by the defendant regarding the victims' lack of consent. The defendant . . . said in his statement . . . . he did not believe the victims when they said no.

. . . .

If these counts are severed as to each individual victim, the jury may be materially misled into inaccurately thinking the defendant misunderstood each victim and thought she meant yes when she said no . . . .

. . . .

In addition, despite defendant's assertions to the contrary, the other[-]crimes evidence may be relevant

16

to the feasibility of the assault of three of the victims. Those three assaults [involving C.R., K.E. and M.M.] took place at the defendant's home. Defendant said in his statement to police his brother lived in the house and he was present when [K.E.] came over. . . . [C.R.] said . . . defendant told her that he took care of his mother . . . . She didn't say . . . that he said mom was home. However, it can be argued that he gave her the impression. In addition, all of those three victims did say that there was a physical struggle and they all verbally told the defendant ["]no.["] Accordingly, the other[-]crimes evidence may be relevant to show feasibility of the defendant assaulting the victims in his home without the other household members hearing or seeing anything.

Next, the judge found the crimes were "similar in kind" and "occurred in less than a two-month period," i.e., in March and April 2017. Additionally, the judge observed that all four victims described how defendant assaulted them and that their videotaped statements, coupled with defendant's statement to the police, established "by clear and convincing evidence that these assaults occurred." The judge highlighted this finding, concluding the State demonstrated by clear and convincing evidence that defendant's sexual encounters with the victims "were not consensual." After considering the victims' statements and text messages from C.R., the judge further noted that "some of this information provided by the women [was] not flattering[,]" yet the victims' statements "were [made] more reliable and more credible by that."

Additionally, the judge determined that "the other[-]crimes evidence is highly probative to the issue of consent and specifically to the defense of mistake or accident based upon the defendant's misunderstanding of the victims' words and actions." She added that the "other[-]crimes evidence is not unduly prejudicial to defendant because it is similar in kind to that of which the jury is already going to hear" and "highly probative to the issue of consent because the State must prove beyond a reasonable doubt that either defendant didn't actually believe that the victims consented[,] or the State must prove beyond a reasonable doubt the defendant's belief was unreasonable." The judge also found this evidence was "highly relevant to the issue of interpretation of the victim[s'] words, actions, and whether [defendant] was reasonably mistaken when he . . . believed that the victims meant yes or no." Based on this analysis, the judge denied the severance motion.

Defendant moved for reconsideration of the February 21, 2018 order. He initially argued that in denying his severance motion, the judge misunderstood his position and mistakenly believed defendant had claimed "he and the alleged victims were playing out some sort of rape fantasy." Defense counsel highlighted that defendant "never actually . . . said that . . . . [H]e never expressed the idea that . . . the expression of a lack of consent on the part of the alleged

victims was part of some sort of fantasy." The judge responded, "That wasn't my intent," and she clarified that in defendant's police interview, defendant referred to "Daddy fantasies." The judge also stated that defense counsel's reference to portions of her prior opinion were taken "out of context[.]" She explained, "defendant admits that he had sex with all four of the victims and claims that each of those encounters [was] consensual." The judge reminded counsel that the State still had the burden to "prove beyond a reasonable doubt the defendant committed an act of sexual penetration without the consent of the victim . . . ." and that in the instant matter, "the other[-]crime[s] evidence is more relevant to the defendant's intent and mental state to prove an absence of mistake, accident, misunderstanding or misinterpretation by the defendant regarding the victim[s'] lack of consent." The judge acknowledged defendant "never explicitly stated that he reasonably believed that the alleged victims meant yes when they said, ['n]o[']" but "defendant did not have to explicitly state this." The judge also conceded, "I got that backwards in my write up for myself." Nonetheless, the judge observed that "when the victims were attempting to stop the sexual act . . . , it is alleged the defendant did not stop, even after some of them repeatedly said, ['n]o.'"

Concluding there was no basis for reconsideration of the February 21 order, the judge denied defendant's reconsideration motion on June 29, 2018. Later that day, defendant pled guilty to sexually assaulting each of the four victims, but under his plea agreement, he reserved the right to appeal the denial of his severance motion.

On appeal, defendant raises the following argument:

> THE MOTION COURT COMMITTED REVERSIBLE ERROR IN DENYING SEVERANCE OF THE CHARGES, BECAUSE THE SEPARATE ALLEGATIONS WERE NOT RELEVANT TO EACH OTHER, THERE EXISTED A MATERIAL QUESTION AS TO WHETHER THE INCIDENT INVOLVING D.F. WAS DIFFERENT FROM THE OTHERS, THE COURT'S CONSIDERATION OF PROOFS IN CHAMBERS DID NOT SUPPORT A FINDING THAT THE BAD ACTS OCCURRED BY CLEAR AND CONVINCING EVIDENCE, AND FAILURE TO SEVER THE CHARGES WOULD SUBSTANTIALLY PREJUDICE THE DEFENSE.

We are not convinced.

Our court rules provide that "[t]wo or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or a similar character[.]" R. 3:7-6. The court may, however, "order an election or separate trials of counts, grant a severance of defendants, or direct other appropriate relief" where "it appears that a

20

defendant . . . is prejudiced by a permissible or mandatory joinder of offenses . . . in an indictment[.]" R. 3:15-2(b).

A mere claim of prejudice is insufficient to support a motion to sever. State v. Moore, 113 N.J. 239, 274 (1988). A defendant is not entitled to severance simply because he or she believes a separate trial "would offer . . . a better chance of acquittal." State v. Johnson, 274 N.J. Super. 137, 151 (App. Div. 1994) (quoting State v. Morales, 138 N.J. Super. 225, 231 (App. Div. 1975)).

"Central to the [severance] inquiry is 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges.'" State v. Chenique-Puey, 145 N.J. 334, 341 (1996) (alteration in original) (quoting State v. Pitts, 116 N.J. 580, 601-02 (1989)). Where the evidence would be admissible in separate trials, joinder is permissible "because 'a defendant will not suffer any more prejudice in a joint trial than he [or she] would in separate trials.'" Ibid. (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)).

Rule 404(b) bars the admission of other-crimes evidence "to prove a person's disposition in order to show that . . . the person acted in conformity

with such disposition."  N.J.R.E. 404(b).  Other-crimes evidence is, however, admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute."  Ibid.

The party seeking to introduce other-crimes evidence must satisfy the four prongs enunciated in Cofield, 127 N.J. at 338.  Thus, under Cofield,

> 1. [t]he evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. [i]t must be similar in kind and reasonably close in time to the offense charged;
>
> 3. [t]he evidence of the other crime must be clear and convincing; and
>
> 4. [t]he probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Ibid.]

The decision to grant or deny a motion to sever is within the trial court's sound discretion.  State v. Morton, 155 N.J. 383, 452 (1998).  We must "defer to the trial court's decision, absent an abuse of discretion."  Chenique-Puey, 145 N.J. at 341.  An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'"  Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571

22

(2002) (quoting Achacoso Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir. 1985)). Thus, absent a finding a judge abused his or her discretion in resolving a severance motion, our courts have upheld the joinder of charges, even in cases involving multiple sexual assaults. See, e.g., State v. Oliver, 133 N.J. 141, 150-56 (1993); State v. Krivacska, 341 N.J. Super. 1, 37-41 (App. Div. 2001).

Similarly, a trial court's decision to deny a motion for reconsideration will be upheld on appeal unless the court abused its discretion. Granata v. Broderick, 446 N.J. Super. 449, 468 (App. Div. 2016). If a motion for reconsideration, on its face, does not demonstrate that the trial court based its decision upon a "palpably incorrect or irrational basis" or failed to consider or appreciate "the significance of probative, competent evidence[,]" then a judge has the discretion to deny the motion. Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996) (quoting D'Atria v. D'Atria, 242 N.J. Super 392, 401-02 (Ch. Div. 1990)). Guided by these standards, we are not persuaded the judge incorrectly denied defendant's severance and reconsideration motions.

Preliminarily, we observe that the judge carefully analyzed the Cofield prongs when deciding both motions. Regarding the first prong, she specifically found the other-crimes evidence was relevant to the issue of intent, because the victims alleged they were assaulted after trying to stop the assaults, but

defendant claimed his encounters with the victims were consensual. Similarly, the judge found such evidence relevant regarding the feasibility of the crimes as to C.R., K.E. and M.M.

The first Cofield prong requires that "the evidence of the prior . . . crime . . . be relevant to a material issue that is genuinely disputed." State v. Covell, 157 N.J. 554, 564-65 (1999). "[T]he primary focus in determining the relevance of evidence is whether there is a logical connection between the proffered evidence and a fact in issue." State v. J.M., 225 N.J. 146, 160 (2016) (quoting State v. Willis, 225 N.J. 85, 98 (2016)). The burden of establishing this connection is not onerous: "if the evidence makes a desired inference more probable than it would be if the evidence were not admitted, then the required logical connection has been satisfied." State v. Williams, 190 N.J. 114, 123 (2007) (describing the standard for such a connection as "generous").

The evidence must also concern a material issue, "such as motive, intent, or an element of the charged offense . . . ." State v. Rose, 206 N.J. 141, 160 (2011). An issue is material if "the matter was projected by the defense as arguable before trial, raised by the defense at trial, or was one that the defense refused to concede." Ibid. (quoting State v. P.S., 202 N.J. 232, 256 (2010)). "[T]he material fact sought to be proved must be one that is actually in

A-2209-18

dispute[.]" J.M., 225 N.J. at 160 (second alteration in original) (quoting Willis, 225 N.J. at 98).

> When a defendant claims that he penetrated with permission, he puts his own state of mind in issue[;] he argues that he reasonably believed that the alleged victim had affirmatively and freely given him permission to penetrate. The State, therefore, can introduce evidence to disprove that the defendant had that state of mind.
>
> [Oliver, 133 N.J. at 155.]

See also State v. Marrero, 148 N.J. 469, 485 (1997) (admitting other-crimes evidence of a prior sexual assault to establish defendant's state of mind and disprove defense's theory that sexual relations were consensual); State in Interest of M.T.S., 129 N.J. 422, 447-48 (1992) (noting that, where an alleged sexual assault does not involve violence or force beyond penetration, "the factfinder must decide whether . . . the defendant reasonably [was led] to believe that the alleged victim had freely given affirmative permission to the specific act of sexual penetration").

Mindful of these principles, we are convinced the judge did not abuse her discretion in finding the other-crimes evidence was relevant to the issue of consent. Indeed, consent was plainly "projected by the defense as arguable before trial," contrary to the victims' position, thereby making it a material issue

in dispute.  <u>Rose</u>, 206 N.J. at 160.  In fact, the defense argued that the victims lied about whether they consented to the sexual encounters.  Consistent with this defense, defendant told the police he understood that "when [women] actually say, [']no stop[,'] [t]hat's when you stop, absolutely."  Therefore, we agree with the judge's determination that the other-crimes evidence was relevant to establish defendant's intent.  Likewise, we agree with the judge that the other-crimes evidence was relevant to the feasibility of the crimes because certain victims, other than D.F., were led to believe defendant lived with at least one other family member.

Regarding the second <u>Cofield</u> prong, it is uncontroverted that defendant's encounters with the victims occurred within a two-month span.  But the record also reflects the crimes were similar in kind.  Indeed, each victim stated defendant initiated contact with her through some social media platform and shortly thereafter, he either arranged to meet the victims in his home, or, in D.F.'s case, invited himself to her home.  Additionally, the victims reported that defendant forced himself on them, after being told to "stop" or "no."  Further, in each case, the sexual encounter occurred at a time when defendant knew he had herpes.  Thus, we agree with the judge's determination that the second <u>Cofield</u> prong was satisfied.

Turning to the third <u>Cofield</u> prong, evidence of other crimes is only admissible if it clear and convincing. 127 N.J. at 323. <u>See</u> <u>State v. Hernandez</u>, 170 N.J. 106, 126 (2001) (holding that uncorroborated testimony by an accomplice could satisfy the "clear and convincing" requirement). Here, defendant argues the trial court erred in failing to conduct an evidentiary hearing regarding the third <u>Cofield</u> prong, and that she mistakenly found the other-crimes evidence was clear and convincing. Again, we disagree.

First, the record reflects that prior to the judge ruling on defendant's severance motion, his attorney did not object to the judge's declaration that she would review the videotaped statements in the record to determine if the State established by clear and convincing evidence that the assaults occurred. Second, even if defendant had requested an evidentiary hearing to address the third <u>Cofield</u> prong, the judge was not obliged to conduct such a hearing, given that defendant already had been indicted for the other crimes at issue. <u>See</u> <u>Rose</u>, 206 N.J. at 163-64. Third, the judge noted that when the victims provided videotaped statements, their responses to questioning by the police were "freely and voluntarily given[,]" and "[n]one of them appeared to be under any type of duress." She also found "some of [the] information provided by the women

27

[was] not flattering[,]" thereby demonstrating the victims "were more reliable and more credible by that." We perceive no basis to disturb these findings.

Finally, regarding the fourth Cofield prong, the judge recognized defendant would be prejudiced by having all counts of the indictment tried together. But she also found the other-crimes evidence the State sought to introduce was highly probative as to the material issue of intent and that the probative value of this evidence outweighed any prejudice to defendant. Again, we decline to conclude the judge abused her discretion in this respect.

Understandably, "whether the probative value of [other-crimes] evidence is outweighed by its apparent prejudice[] is generally the most difficult part of the [Cofield] test." State v. Barden, 195 N.J. 375, 389 (2008). Indeed, "[b]ecause of the damaging nature of such evidence, the trial court must engage in a 'careful and pragmatic evaluation' of the evidence to determine whether the probative worth of the evidence is outweighed by its potential for undue prejudice." Ibid. (quoting State v. Stevens, 115 N.J. 289, 303 (1989)). Thus, whether to admit "[o]ther-crimes evidence . . . necessitates a more searching inquiry than that required by N.J.R.E. 403[,]" because "the potential for undue prejudice need only outweigh probative value to warrant exclusion" of other-crime evidence. State v. Reddish, 181 N.J. 553, 608 (2004). But "[s]ome types

of evidence require a very strong showing of prejudice to justify exclusion.  One example is evidence of motive or intent."  Covell, 157 N.J. at 570.

Here, considering the similar nature of the crimes, and defendant's claims that his sexual encounters with each victim were consensual, the judge found the

> other-crimes evidence is not unduly prejudicial to defendant because it is similar in kind to that . . . which the jury is already going to hear.  The other-crimes evidence is . . . highly probative to the issue of consent because the State must prove beyond a reasonable doubt that either defendant didn't actually believe that the victims consented, or the State must prove beyond a reasonable doubt the defendant's belief was unreasonable.

Given the judge's cogent analysis, and considering defendant's intent was at issue, we cannot conclude the judge abused her discretion in finding the probative value of the other-crimes evidence was not outweighed by its apparent prejudice to defendant.

In sum, we discern no abuse of discretion in the judge's denial of defendant's severance and reconsideration motions.  To the extent we have not addressed other contentions raised by defendant, we conclude they lack sufficient merit to warrant discussion in this opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2209-18